*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0416p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 05-6304

VICTOR M. GARRIDO,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 03-00036—Joseph H. McKinley, Jr., District Judge.

Argued: September 18, 2006

Decided and Filed: November 9, 2006

Before: GUY, GILMAN, and ROGERS, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Jeffrey M. Brandt, ROBINSON & BRANDT, Cincinnati, Ohio, for Appellant. Monica Wheatley, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Jeffrey M. Brandt, ROBINSON & BRANDT, Cincinnati, Ohio, for Appellant. Monica Wheatley, Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. Officers from the Kentucky Department of Vehicle Enforcement (KVE) stopped the truck being driven by Victor M. Garrido on an interstate highway near Bowling Green, Kentucky for an alleged traffic violation. They then engaged in an hour-long safety inspection of the vehicle, following which the officers obtained Garrido's verbal consent to search the passenger compartment. The subsequent search, aided by a trained drug-detection dog, uncovered 161 grams of heroin and other incriminating evidence. Garrido moved to suppress the evidence discovered during the search, but the district court denied his motion. A jury subsequently convicted him of possessing heroin with the intent to distribute the drug. He was sentenced to 63 months of imprisonment and 4 years of supervised release.

1

Garrido now appeals, arguing that (1) the district court erred in denying his motion to suppress, and (2) the evidence presented by the government was insufficient to support his conviction. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.    Factual background

At approximately 7:00 p.m. on May 21, 2003, KVE Officers Shannon Chelf and Joey Conn were traveling south in separate squad cars on Interstate 65 outside of Bowling Green, Kentucky. They came upon two trucks with out-of-state registrations—a "bobtail tractor" driven by Victor Garrido and a tractor-trailer based in Chatsworth, California. (A bobtail tractor is the motorized portion of a tractor-trailer rig driven without a trailer attached to it.) Chelf and Conn noticed several details about the bobtail tractor that caught their attention. They first observed that it was following too closely to the truck in front of it, in violation of Kentucky law. Next, they saw that the so-called "fifth wheel," the area where the trailer attaches to the tractor, appeared to be dry and rusty, indicating that the tractor had not been used for transport recently. Their third observation was that the decal showing the name of the trucking company—E-Freight—was unfamiliar to the officers and was awkwardly placed on the passenger-side door, as if it had been hastily affixed.

When Officers Chelf and Conn first noticed the bobtail tractor and the California-based truck in front of it, the officers were passing through a construction zone on Interstate 65. Traffic was narrowed to two lanes in each direction and there was no emergency lane on the shoulder because the construction zone was marked off with concrete barriers on both sides. Communicating over their radios, Chelf and Conn decided to stop each of the two trucks at a point on the interstate beyond the area of construction. The two officers agreed that Chelf would conduct a safety inspection on the first of the two vehicles to reach his position and Conn would conduct an inspection on the second one. Although the other truck apparently exited the interstate before it reached the point where the officers had stopped, Chelf again spotted the bobtail tractor operated by Garrido and pulled it over in a rest area for the safety inspection. Garrido was accompanied in the cab of the tractor by his sister Sara Garrido and her three-year-old son.

Officer Chelf performed what he described as a "Level 2" safety inspection, which included not only reviewing Garrido's commercial driver's license, logbook, and medical certificate, but also checking the vehicle's lights, tires, air brakes, buzzer, instruments and gauges, fire extinguisher, and safety reflectors. Shortly after Chelf began the inspection, Officer Conn arrived on the scene to provide assistance. Approximately 15 to 20 minutes into the inspection, Chelf also contacted Officer Steven Burke, a canine handler, and asked Burke to head toward the location of the safety inspection and to remain available in case Chelf needed him and his trained drug-detection dog.

Several bits of information acquired during the safety inspection and the questioning of Garrido raised the suspicion of the officers. First, the paperwork turned over by Garrido revealed that (1) he did not have a current medical certificate, (2) the logbook contained lengthy periods of off-duty time in Dallas, Texas and in Garrido's home state of Ohio despite Garrido's indication that E-Freight operated mainly in the Northeast, and (3) the lease agreement for the tractor was mostly blank. The logbook also indicated that the truck was leased to a company called 3W, whereas the decal on the outside of the tractor listed the company's name as E-Freight. In response to questions from Officer Chelf, Garrido said that he owned the truck, which was leased to E-Freight, and that he was driving to Memphis, Tennessee to drop off his sister and nephew. Chelf questioned Garrido about the apparent discrepancy between the name shown on the tractor and the name in the logbook. Garrido responded that he owned five tractors, four of which were leased to 3W and the fifth to E-Freight. He later said, however, that four had been leased to E-Freight and only one to 3W.

Officer Chelf attempted to verify Garrido's explanation by radioing for E-Freight's telephone number and then calling the company. He spoke to an E-Freight representative who was not familiar with either Garrido or the unit number for the vehicle provided by Garrido. Officer Conn later directly asked Garrido for a number at which E-Freight could be contacted, but when Conn attempted to call the number that Garrido retrieved from his cellular phone, he received an automated message indicating that the number was not in service. During this time, Chelf also contacted the El Paso Intelligence Center (EPIC), an information clearinghouse administered by the Drug Enforcement Agency (DEA). An official at EPIC reported to Chelf that Garrido had recently crossed the Mexican-U.S. border into Texas, and that he had been involved in a drug-related incident in 1997. Garrido has contended from the beginning of this case, however, that this report is entirely false. Ultimately, because the government failed to produce any evidence concerning the EPIC report's reliability, the district court gave Chelf's reliance on it "no weight whatsoever." The Presentence Report shows that Garrido had no prior criminal convictions.

Suspicious because of what he later described as his "odd" conversation with Garrido and the information gleaned from the thorough inspection, Officer Chelf prepared the safety-inspection report as well as a citation for Garrido's failure to have the required medical certificate. Chelf then asked Garrido, who had earlier complained about the economics of the industry, if the $200 fine would put an undue or heavy burden on him. Garrido responded in a friendly manner that it would not, surprising Chelf, who then issued the citation and the safety-inspection report. One hour and five minutes elapsed between the time that Chelf stopped Garrido and the issuance of the citation.

After handing Garrido the citation and inspection report, Officer Chelf asked Garrido a series of follow-up questions about his business and his relationship, if any, with E-Freight. Unsatisfied by what he viewed as "evasive" answers, Chelf then asked Garrido whether he was aware that the United States was "on a heightened terror alert." (The threat level had been raised to orange, meaning "High," the day prior to the stop.) Garrido answered that he was aware of the terror alert. Chelf next asked Garrido if he had any weapons, drugs, large amounts of money, or a radar detector. Garrido replied that he did not.

Officer Chelf then sought consent to search Garrido's tractor. According to Officers Chelf and Conn, Garrido gave verbal consent but refused to sign a standard consent form. He had been shown the form, however, and he wrote his initials next to the spot where Chelf had noted Garrido's verbal consent. The officers also sought consent from Sara Garrido to search her personal possessions. Unlike her brother, she signed the consent form. Garrido does not contest on appeal that he gave verbal consent, but argues that the consent was invalid because it was obtained during an unlawful detention.

Shortly after Officer Chelf had secured Garrido's verbal consent, Officer Burke, the canine handler, arrived on the scene. He walked the trained drug-detection dog around the vehicle. Burke told Chelf that the dog had alerted to the presence of narcotics. The officers then began to search the inside of the tractor. When they had been doing so for approximately five minutes, Garrido approached the vehicle in an agitated state and demanded that the officers exit the vehicle. Chelf explained that the dog's alert obviated the need for consent and that the search would continue. Shortly thereafter, Officer Conn located in the headliner compartment of the truck a plastic bag that contained pellets and a powdery substance. A field test indicated that the substance was opium-based, and later tests confirmed that the bag contained approximately 161 grams of heroin. Also uncovered in the search were digital scales (inside a backpack in the sleeper area), business cards, an airline-ticket stub in Garrido's name, and a newspaper article (portions of which had been underlined) that discussed the methods that a Colombian drug smuggling ring used to conceal and smuggle heroin. The officers arrested Garrido after completing the search.

**B.      Procedural background**

Garrido was initially charged in state court.  At the state-court preliminary hearing held in May of 2003, Officer Chelf testified as to the circumstances surrounding the stop, search, and eventual arrest.  He testified on direct examination that the initial stop was "[j]ust a random safety inspection."  When cross-examined, however, Chelf said that "when [he and Officer Conn] initially observed [Garrido] he was following too closely in the construction zone."  Chelf acknowledged that Garrido was not ultimately cited for that infraction.

Federal authorities later assumed control of the case, securing an indictment that charged Garrido with knowingly and intentionally possessing 100 grams or more of heroin with the intent to distribute the drug, in violation of 21 U.S.C. § 841(a)(1).  The indictment also sought forfeiture of the truck and other property used in furtherance of the alleged crime.  Garrido responded by filing a motion to suppress the drugs and other evidence seized during the search.  The district court conducted a suppression hearing over the course of two days in May of 2004.  It heard testimony from Officers Chelf, Conn, and Burke, as well as from Sara Garrido.  Both parties filed posthearing memoranda in support of their respective positions.

In August of 2004, the district court issued an opinion that denied Garrido's motion to suppress.  Expressing some frustration with the way in which the parties had framed the relevant issues, the district court nevertheless structured its analysis around the party's presentations.  The court first explained that it credited Officer Chelf's testimony that Garrido was following too closely to the truck in front of him, so that the officers had probable cause to believe that Garrido had violated the traffic laws.  And because the officers had probable cause to believe that Garrido had violated the law, the court concluded that the initial stop was lawful even if the officers' true intention was to search for contraband and even if the officers never cited Garrido for the traffic infraction. *See United States v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003) (holding that observation by narcotics agents of a vehicle running a red light justified stopping the vehicle, regardless of the agents' failure to issue a traffic ticket and their admitted subjective intent to investigate for drug activity).

The district court then determined, based upon the totality of the circumstances, that the officers had a reasonable suspicion of wrongdoing that supported their decision to detain Garrido beyond the completion of the safety inspection.  In the court's view, eight factors combined to justify the officers' belief that Garrido was engaged in criminal activity: (1) the neglected condition of the fifth wheel; (2) the manner in which the decal had been applied to the tractor; (3) the excessive down-time indicated in the logbook; (4) the expired medical certificate; (5) the lease agreement, which was largely blank; (6) Garrido's evasive and inconsistent answers to the officers' questions; (7) his "overly friendly" attitude and lack of concern about the amount of the fine; and (8) the fact that a representative of E-Freight claimed not to know Garrido and said that the company had no relationship with him.  The court concluded that the government had carried its burden of proving that Garrido consented to the initial search and that the drug-detection dog's alert to the presence of narcotics "was competent and reliable."

After the district court denied his motion to suppress, Garrido exercised his right to a jury trial on the charge against him.  The government introduced the physical evidence recovered during the search as well as testimony from Officers Chelf, Conn, and Burke, DEA Agent Jeffrey Scott (who testified as an expert witness), and Kimberly Redmond, the former CEO of E-Freight.  In his defense, Garrido called Jacqueline Greer, who had worked for him as a recruiter of drivers in Memphis.  The jury found Garrido guilty of the offense charged in the indictment.  This timely appeal followed.

## II. ANALYSIS

### A.      Standard of review

We review the denial of a motion to suppress de novo, but will accept the district court's factual findings unless they are clearly erroneous. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). A factual finding "is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006) (citation and quotation marks omitted). Furthermore, we accord "deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a determination." *United States v. Hill*, 195 F.3d 258, 264-65 (6th Cir. 1999). The evidence must be considered in the light most favorable to the party that prevailed in the court below—in this case, the government. *See id.* at 264.

### B.      The district court did not clearly err in determining that the officers had probable cause to believe that Garrido had committed a traffic offense

"A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct." *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). Accordingly, a roadside detention is lawful so long as the officer has probable cause to believe that the motorist has violated the traffic laws. *See United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003) ("The Fourth Amendment . . . permits an officer who has probable cause to believe that a traffic violation is occurring to detain the automobile, regardless of the officer's subjective motivation for the stop."). The district court in the present case found that Garrido had violated Ky. Rev. Stat. § 189.340(8)(b) by following too closely to the vehicle in front of him. Garrido argues that the district court clearly erred in finding that a traffic violation had occurred and in upholding the legality of the stop on that basis.

The traffic law cited by the district court, Ky. Rev. Stat. § 189.340(8)(b), provides that an "operator of any motor truck, semitrailer truck, bus or heavy construction equipment unit when traveling upon a highway outside of a business or residential district shall not follow within two hundred fifty (250) feet of another such vehicle or equipment unit." Officer Chelf testified that Garrido's bobtail tractor was within "two to three cars lengths," or approximately 30 feet behind the truck in front of him. Chelf had earlier stated, both on cross-examination at the state court preliminary hearing and on direct examination at the district court suppression hearing, that Garrido was "too close" to the other truck. Officer Conn similarly testified that one of his first observations that night was that Garrido's tractor "was following very closely to a truck in front of it." The district court, which has the "primary responsibility for determining witness credibility," *United States v. Akram*, 165 F.3d 452, 455 (6th Cir. 1999), believed the testimony of the officers and concluded that Garrido had in fact violated Ky. Rev. Stat. § 189.340(8)(b).

Garrido's attack on this conclusion is threefold. He first points to the reports that Officer Chelf completed at the scene and the written summaries that Officers Chelf and Conn filed in the days following the safety inspection. Those reports, Garrido correctly notes, make no mention of a traffic violation, and instead indicate that the nature of the stop was "Random" and a "Drug Interdiction Search." Second, Garrido contends that other aspects of the officers' testimony—particularly their admission that they intended from the outset to conduct a full safety inspection of the two trucks—undermine their credibility. Garrido finally maintains that the officers' acknowledgment that all of the vehicles in the construction zone "were jammed up" and traveling close together reveals that they singled out Garrido for reasons other than a traffic violation.

Although each of these arguments has force as a matter of fact and common sense, none of them is legally availing. Garrido's first argument fails because this court has held that "continuing to detain a motorist does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation." *United States v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003). The fact that neither Officer Chelf nor Officer Conn eventually decided to cite Garrido for following too closely, in other words, does not render the stop unlawful after the fact.

On the other hand, the officers' contemporaneous account of the incident does speak to their credibility, which Garrido assails in his second argument. Garrido points to testimony by Officers Chelf and Conn that their initial observations all involved factors that made the bobtail tractor a candidate for a safety inspection as evidence either that no traffic violation actually occurred or that the proffered violation was developed as an after-the-fact justification. But this argument fails for two reasons. First, this court "give[s] deference to the district court's assessment of credibility inasmuch as [that] court was in the best position to make such a determination." *United States v. Hill*, 195 F.3d 258, 264-65 (6th Cir. 1999). The district court here could have reasonably concluded that the consistency of the two officers' accounts, as well as the fact that Chelf also mentioned the traffic violation at the state-court hearing held just days after the stop, lent credibility to their version of the events. Second, Garrido's argument once again centers on the subjective motivations of the officers, which both this court and the Supreme Court have held are irrelevant in determining the legality of the stop. *See Burton*, 334 F.3d at 516 (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)).

This court's decision in *Akram*, 165 F.3d at 455-56, is instructive with regard to each of these two points. The two defendants in *Akram* were stopped for speeding by Officer Gooding while driving east on the Ohio Turnpike in a U-Haul truck. After inconsistent answers given by the defendants aroused Gooding's suspicions, he contacted Officer Newburn, who operated a canine unit. The trained dog alerted, but no drugs were found in the U-Haul. *Id.* at 454. Instead, the officers found videotapes that they believed were counterfeit. Unsure how to proceed, the officers released the two defendants with a warning. The very next day, however, Officer Newburn saw the same U-Haul (although he said that he did not realize it was the same one), this time traveling westbound on the Ohio Turnpike, change lanes without signaling—a violation of Ohio law. *Id.* After contacting Gooding, Newburn brought the dog around the vehicle, and the dog again alerted. A subsequent search again uncovered no drugs, but revealed counterfeit tapes, leading to federal charges against the defendants.

Over a strong dissent from Judge Guy, this court affirmed the district court's conclusion that the second traffic stop was lawful because the U-Haul had violated a state traffic law. This court explained that, to "hold the stop unconstitutional," it would have "to conclude that [Officer] Newburn was lying not just about his motive for the stop but also about the historical fact of whether the truck failed to signal." *Id.* at 455. The *Akram* majority noted that the district court, charged with the primary responsibility for determining witness credibility, had credited Newburn's testimony. *Id.* at 455-56. Ultimately, the majority in *Akram* held that the officers' alleged interest in uncovering drugs was insufficient to undermine the likelihood that the driver had committed a traffic violation. *Id.* at 456. The majority also emphasized that the district court could have found Officer Newburn's account of the traffic violation especially credible because it came "in response to a question from the court, rather than [as] part of the prosecution's justification for the stop." *Id.*

In the present case, as in *Akram*, we cannot reject the district court's basis for upholding the stop unless we conclude that Officers Chelf and Conn "were lying not just about [their] motive for the stop but also about the historical fact" of whether the truck was following too closely. *See id.* at 455. Garrido has offered no proof, however, that the "historical fact" of the traffic violation did not actually occur. He has not provided "any contradictory testimony" to show that his bobtail tractor was more than 30 feet behind the other truck—the distance identified by Officer Chelf in his

direct testimony. *Id.* at 456. Finally, just as the *Akram* majority noted various reasons why the district court could have found Officer Newburn's testimony especially credible, the district court in this case had reason to believe Officer Chelf's account of the traffic violation because (1) he mentioned it in response to a question during a hearing held just days after the incident, and (2) the government did not press the existence of a traffic violation as the exclusive means of upholding the initial stop. *See id.*

The third component of Garrido's argument—that he could not have violated the traffic laws because all of the vehicles were close together in the construction zone—is similarly unavailing. He has not cited any authority for the proposition that Ky. Rev. Stat. § 189.340(8)(b) ceases to apply under heavy traffic conditions. And while most officers would likely be hesitant to enforce distance restrictions during a bottleneck, the law does not require them to be lenient. What Garrido is really getting at is that the traffic congestion further demonstrates that the officers could not have been in a traffic-enforcement mode when they selected his truck for a roadside stop. That may very well be true. Again, however, the officers' subjective motivation for detaining Garrido is irrelevant so "long as [they] had probable cause to initially stop the vehicle." *See Hill*, 195 F.3d at 264. Because the district court assessed the credibility of the testifying officers and determined that Garrido in fact violated the traffic laws, we find no error in its determination that the initial traffic stop was lawful.

## C.     The officers had authority to conduct a safety inspection

Although Officers Chelf and Conn initially pulled Garrido's truck over because of a traffic violation, they proceeded to conduct an inspection of his vehicle pursuant to Kentucky's safety inspection law. *See* Ky. Rev. Stat. § 281.755(1). This inspection lasted approximately one hour and five minutes, during which time the officers examined Garrido's commercial driver's license, logbook, and medical certificate. They also inspected the truck itself, including the lights, tires, air brakes, buzzer, instruments and gauges, fire extinguisher, and safety reflectors. The district court, having determined that the initial stop of Garrido's vehicle was supported by probable cause, declined to address the permissibility of the ensuing inspection. On review, however, this issue warrants additional attention because the inspection extended the length and scope of Garrido's stop beyond what would generally be permissible incident to an ordinary traffic stop.

In *United States v. Dominguez-Prieto*, 923 F.2d 464 (6th Cir. 1991), this court upheld the roadside inspection of a commercial truck conducted pursuant to a Tennessee law that permits warrantless stops and inspections upon a "reasonable belief" that a safety violation is occurring. The court held that the inspection in that case was constitutional under the exception to the warrant requirement for searches of "closely" or "pervasively" regulated industries. *See id.* at 467 (citing *Donavan v. Dewey*, 452 U.S. 594 (1981), and *New York v. Burger*, 482 U.S. 691 (1987)). Significantly, the court noted that "[p]erhaps most important" to its analysis under existing Supreme Court precedent was Tennessee's requirement that the officers have a "reasonable belief" that a violation is occurring before inspecting a vehicle. *Id.* at 469. In contrast, the Kentucky inspection statute at issue contains no such requirement, and instead permits inspection of commercial motor carriers "at any time or place." Ky. Rev. Stat. § 281.755.

We need not resolve the question of whether Ky. Rev. Stat. § 281.755 would constitutionally permit inspection "at any time or place," however, because Officers Chelf and Conn in fact inspected Garrido's truck based on a "reasonable belief" that a violation was occurring. The officers testified that, prior to pulling over Garrido's truck, they noted several suspicious characteristics that led them to reasonably believe that the truck was in violation of the applicable safety regulations. In particular, Chelf and Conn noted both that the so-called "fifth wheel" area of the truck appeared to be dry and rusty, indicating that it had not been used for transport recently, and that the truck's unfamiliar E-Freight name decal was awkwardly placed on the passenger-side door, as if it had been hastily affixed. These observations, taken together, gave rise to a reasonable belief that Garrido's

truck was not well-maintained and likely was in violation of the commercial trucking safety regulations. We conclude that the officers' reasonable belief in this case justified their inspection of Garrido's truck, and we reserve for another day the broader question not addressed by either Garrido or the district court regarding the constitutionality of Kentucky's commercial-truck inspection law.

**D.        Garrido's continued detention was reasonable under this court's precedents**

"Once the purpose of an ordinary traffic stop is completed, the officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006) (citations and quotation marks omitted). The key question before us, therefore, is whether the officers had a reasonable suspicion to detain Garrido beyond the moment that the safety inspection was completed. "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001).

The Supreme Court has emphasized that reasonable suspicion is "something more than an inchoate and unparticularized suspicion or hunch," *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation and quotation marks omitted), and that reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted) (holding that a combination of suspicious factors, including a van traveling on a known smuggling route in a remote area, the driver slowing down upon noticing the officer, and the passengers possibly concealing cargo by having their knees raised, all gave rise to reasonable suspicion). Moreover, "the totality of the circumstances approach allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002) (interpreting the Supreme Court's then-recent decision in *Arvizu*). A district court's determination that the officers had a reasonable suspicion is a mixed question of law and fact that we review de novo. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002).

In determining that the officers had a reasonable suspicion to believe that Garrido was involved in criminal activity, the district court relied on the eight factors set forth in Part I.B. above. The district court essentially concluded that these factors diverged so significantly from what normally occurs during a stop and inspection of a commercial bobtail tractor that the officers were justified in concluding that something was amiss.

This court's most recent precedents are inconclusive on this issue. *Compare United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004) (concluding that the motorists' nervousness, their allegedly conflicting explanations of travel plans, and the movement of one from the back to the driver's seat did not suffice to create a reasonable suspicion); *Townsend*, 305 F.3d at 542-45 (finding that ten factors, including dubious travel plans, three cell phones in the car, and the driver's history of weapons offenses, did not rise to the level of a reasonable suspicion); *and Smith*, 263 F.3d at 588-94 (concluding that nine factors, including the stoned appearance of one vehicle occupant, food wrappers in the car, and the nervousness of the occupants, did not establish a reasonable suspicion); *with United States v. Davis*, 430 F.3d 345, 355-56 (6th Cir. 2005) (holding that a driver's meeting with a known drug dealer justified continued detention until a drug-sniffing dog could arrive, but that additional detention after the dog failed to alert was unreasonable); *Hill*, 195 F.3d at 270-73 (concluding that eight factors, including a dubious explanation for a cross-country trip, nervousness, and the cash rental of a U-Haul, justified continued detention); *and United States v.*

*Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) (holding that eight factors, including the lack of registration and any proof of insurance, and the nervousness and criminal record of drug violations of the driver, sufficed to justify continued detention).

One of Garrido's principal arguments on appeal can be rejected at the outset. Garrido maintains that none of the facts cited by the officers and the district court was itself "indicative of criminal activity." He is in essence arguing that because each factor had a possible innocent explanation, and because he provided such an explanation, those factors could not give rise to a reasonable suspicion of criminal activity. Both the Supreme Court and this court, however, have rejected this line of argument. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (rejecting the court of appeals's view that each of the officer's observations "was entitled to 'no weight'" simply because each "was by itself readily susceptible to an innocent explanation"); *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005) ("In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot.").

In *Arvizu*, the Supreme Court reiterated what it had already established in *Terry v. Ohio*, 392 U.S. 1, 22 (1968)—that "each of [a] series of acts," though "perhaps innocent in itself," may justify "further investigation" when viewed as a whole. 534 U.S. at 274-75 (quotation marks omitted); *see also Townsend*, 305 F.3d at 542 (explaining that this court is charged with "determin[ing] whether the *combination of factors* considered by the officer is sufficient for reasonable suspicion") (emphasis in original). The district court employed a similar analysis, recognizing that the eight factors it identified, "while perhaps innocent in isolation but judged against what is normal, were sufficient to generate the necessary reasonable suspicion of criminal activity."

We agree. The district court's emphasis on the eighth factor cited in Part I.B. above—the fact that the officers' attempts to corroborate Garrido's relationship with E-Freight indicated that no such relationship existed—is particularly persuasive. In addition to the response received by Officer Chelf when he successfully contacted E-Freight, Officer Conn obtained from Garrido a second phone number, which turned out to be out of service. These events, when combined with the fact that Garrido's logbook showed that the tractor was leased to the 3W company rather than to E-Freight, could reasonably have caused the officers to believe that Garrido was lying in an attempt to conceal unlawful activity.

Moreover, the officers were entitled to judge Garrido's behavior and the information obtained during the safety inspection against the backdrop of their own experience and knowledge of what constitutes a lawful trucking operation. *See Hill*, 195 F.3d at 270 (citing with approval the district court's view that the arresting officer "was entitled to assess the circumstances and defendant's [sic] in light of his experience as a police officer and his knowledge of drug courier activity") (alteration in original). Even though Officer Chelf learned the following day that Garrido in fact did have a relationship with E-Freight, the information available to him at the time appeared to demonstrate that Garrido was lying about that relationship and left unexplained the hastily applied E-Freight decal on the truck. The officer's refusal to credit Garrido's story was therefore understandable.

An Eighth Circuit case arising in the safety-inspection setting is instructive in this regard. In *United States v. Johnson*, 285 F.3d 744 (8th Cir. 2002), the defendant was a truck driver who had been arrested after a search of the tractor-trailer that he was driving uncovered 2,200 pounds of cocaine. Johnson had stopped at an Arkansas weigh station, where a state trooper asked him a series of questions and examined his paperwork. *Id.* at 746. Troubled by Johnson's answers, by incomplete logbook entries, and by the truck's indirect route, the officer proceeded to conduct a safety inspection of the vehicle. When Johnson began acting nervous and moving boxes around, the officer called for assistance. A subsequent search uncovered the illegal drugs. *Id.*

The Eighth Circuit held that Johnson's suspicious conduct, along with the irregularities noted in the vehicle's paperwork, established a reasonable suspicion of criminal activity. Prominent among the factors highlighted by the *Johnson* court were the "incomplete logbook entries, Johnson's confusion as to his final destination, and the incomplete bill of lading." *Id.* at 749. In the present case, the significant amount of downtime indicated in Garrido's logbook, a largely blank lease agreement, and Garrido's hazy account of where he was headed and how he would return to Ohio similarly contributed to creating a reasonable suspicion in the minds of the two experienced KVE officers. *See id.*

Because their initial attempts to corroborate the veracity of Garrido's story had done nothing to dispel their suspicions, the officers acted reasonably in continuing to question Garrido on the same subjects, even if that questioning stretched slightly beyond the completion of the safety inspection. *See United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (explaining that the officers were required to release the defendant once they had "used all of the appropriate means available to them to allay their concerns of criminal activity"). The stop would have become unlawful if the officers' questioning had unduly extended the duration of the already lengthy stop, or if Garrido had not voluntarily consented to the search just minutes later. *See Davis*, 430 F.3d at 354-56. Garrido's consent, however, coupled with the officers' growing suspicion, justified the use of Officer Burke's drug-detection dog to inspect Garrido's truck. *See United States v. Perez*, 440 F.3d 363, 375 (6th Cir. 2006) (noting that the Supreme Court, in *Illinois v. Caballes*, 543 U.S. 405 (2005), rejected the proposition that reasonable suspicion is required before using a drug-detection dog to sniff a vehicle during a legitimate traffic stop). Once the dog alerted, the officers' continuing search of the vehicle was similarly justified. *Id.*

**E.      The evidence presented by the government was sufficient to support the jury's verdict**

Garrido's second argument is that his conviction must be reversed because the government failed to introduce sufficient evidence to prove that he knowingly possessed the seized heroin with the specific intent to distribute it, as is required for a conviction under 21 U.S.C. § 841(a)(1). *See United States v. August*, 984 F.2d 705, 712 (6th Cir. 1992) (per curiam) ("Under § 841(a)(1), the essential elements the government was required to prove are that August knowingly possessed drugs with the intent to distribute them.").

*1.      Standard of review*

Garrido bears "a very heavy burden" in challenging the sufficiency of the evidence. *See United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000). Our standard of review in evaluating insufficiency-of-the-evidence claims asks "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In conducting this review, we will not weigh the evidence or consider the credibility of the witnesses. *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002).

*2.      Sufficiency of the evidence*

Garrido's sufficiency challenge focuses on the knowledge and intent elements of the crime. He argues that although the evidence "may have demonstrated that [he] constructively possessed heroin by operating a tractor that turned out to have heroin hidden in [it]," that evidence does not prove that he "knew heroin was in the tractor." Garrido cites *United States v. White*, 932 F.2d 588 (6th Cir. 1991) (per curiam), for the proposition that proximity to drugs alone does not prove the required specific intent to distribute those drugs. This court in *White* concluded that a defendant's proximity to a patch of marijuana growing near his property was insufficient in and of itself to

establish his possession or intention to distribute the drug. *Id*. at 589. Garrido's defense theory, in short, was that he had picked up a truck abandoned by one of his drivers and that he had no knowledge that illegal drugs were hidden in the vehicle.

Contrary to Garrido's arguments, we conclude that the record contains sufficient evidence from which a rational factfinder could have found beyond a reasonable doubt that Garrido both knew the heroin was in the vehicle and that he intended to distribute it. Perhaps most damaging to Garrido's defense were the other pieces of drug-related evidence uncovered during the search. Specifically, the government introduced the digital scales found in a duffle bag in the tractor, as well as testimony from the arresting officers that those scales are "routinely" associated with drug arrests. The government also introduced an airline ticket stub in Garrido's name found in the tractor. Finally, the government presented a newspaper article, found by Officer Burke during the search, that discussed the methods that a Colombian drug-smuggling ring used to conceal and smuggle heroin—methods that resembled the way in which the heroin seized from Garrido's vehicle was packaged. Portions of that newspaper article had been underlined.

In addition to this physical evidence, the testimony of both the arresting officers and DEA Agent Jeffrey Scott undermined Garrido's claim that he had no knowledge of the heroin and had no intent to distribute it. Officer Conn described to the jury the manner in which Garrido's temperament changed after the drug dog alerted and the officers' search of the vehicle became more intrusive. According to Officer Conn, Garrido became "irate" and "belligerent" and acted "combative" toward Officer Chelf. The jury could have viewed this sudden transformation as fear of discovery or consciousness of guilt, reactions that sufficed to overcome some of the potentially exculpatory information brought to light by Garrido (such as the fact that his fingerprints were not found on the plastic bag containing the drugs).

Furthermore, DEA Agent Scott testified that heroin is typically sold in small quantities, that it is often divided up using digital scales, and that the heroin seized from Garrido's vehicle had a street value of approximately $50,000. From this testimony, along with the underlined newspaper article that detailed methods of drug smuggling, a rational factfinder could have inferred not just that Garrido knew about the heroin hidden in the truck, but also that he intended to distribute it. Nor, the jury could infer, would anyone likely have abandoned drugs of this value as Garrido contended.

The thrust of Garrido's argument to the contrary is that, given his status as a small business owner and the spouse of a recent law school graduate, he would not have engaged in illegal drug transactions, and that the jury simply reached the wrong verdict. But whether we would reach the same conclusion as the jury is decidedly *not* the standard for evaluating the sufficiency of the evidence on appeal. Indeed, we only examine whether, viewing the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Chavis*, 296 F.3d at 455 (citation and quotation marks omitted) (emphasis in original). Because the government introduced both testimony and physical evidence from which a rational juror could have found the essential elements of the charged offense beyond a reasonable doubt, *see Jackson*, 443 U.S. at 319, we reject Garrido's insufficiency-of-the-evidence claim.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.