RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0297p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellant,*

      *v.*

DEWAYNE D. ELLIS,

      *Defendant-Appellee.*

No. 05-4576

> Appeal from the United States District Court
> for the Northern District of Ohio at Cleveland.
> No. 04-00272—Solomon Oliver, Jr., District Judge.

Argued: March 6, 2007

Decided and Filed: August 7, 2007

Before: ROGERS and GRIFFIN, Circuit Judges; RUSSELL, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Lori A. Hendrickson, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellant. Philip J. Korey, Cleveland, Ohio, for Appellee. **ON BRIEF:** Lori A. Hendrickson, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellant. Philip J. Korey, Cleveland, Ohio, for Appellee.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge. Plaintiff, the United States of America, appeals an order of the district court granting defendant Dewayne Ellis's motion to suppress. The government argues that the district court erred by suppressing incriminating evidence seized during a traffic stop and defendant's post-arrest statements. For the reasons set forth below, we agree and reverse and remand.

I.

In its order, the district court made the following findings of fact:

_____

[*] The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

1

On Friday, April 16, 2004, Trooper [Andrew] Topp, an Ohio State Highway Patrol Trooper, was working the 11:00 p.m. to 7:00 a.m. shift. (5/27/05 Hrg. Tr. 3-4.) Some time after 3:00 a.m., Trooper Topp observed a white Ford Ranger truck (the "truck") traveling southbound on Interstate 71 in Ashland County, Ohio. (*Id*. at 8.) The truck was weaving in its lane and had crossed over the white dividing line between the shoulder and the right lane several times. (*Id*. at 4-5.) Trooper Topp followed the vehicle in his police cruiser, and "ran" the truck's registration plate. (*Id*. at 5.) The registration matched the truck, showing that it was registered to an Arthur Daugherty. At this point, Trooper Topp activated the lights on his police cruiser and pulled the truck over to the side of the road.[1] The time, as recorded by the automatically activated camera on top of the cruiser, was 3:23 a.m.[2] (*Id*. at 8; 34-36.)

Two people were in the truck: the driver was a white male in his early 70s, and the passenger was a black male closer to 30. (*Id*. at 12, 42.) Trooper Topp approached the vehicle from the driver's side and asked the driver if he was tired or sleepy. (*Id*. at 8.) The driver responded that he was a "little bit" tired. (*Id*.) Trooper Topp also asked the driver for his license and registration, and asked where he was coming from. (*Id*. at 8.) The driver provided his license and registration, and told Trooper Topp that he was coming from Cleveland. (*Id*.) The driver's license identified the driver as Arthur Daugherty, and this name matched the truck registration Trooper Topp had received before pulling the truck over. (*Id*. at 9.) Trooper Topp did not smell alcohol while standing at Daugherty's side of the car. (*Id*. at 47.) Moreover, Daugherty did not appear to be under the influence of alcohol. (*Id*. at 39.)

At 3:25 a.m., Trooper Topp walked over to the passenger side of the truck and asked the passenger where he lived. (Police Video, Def. Ex. A at 3:25:00.) Trooper Topp also asked if the passenger had any identification. (Hrg. Tr. 10.) The passenger responded that he did not have identification on him. (*Id*.) Trooper Topp then asked for the passenger's social security number, and the passenger stated he did not know it. (*Id*.) Trooper Topp asked for the passenger's name and date of birth, and the passenger identified himself as Wayne D. McCarthy, born May 9, 1973. (*Id*.) Trooper Topp asked the passenger "if it was odd or if he thought it was odd that he did not know his social security number being 30 years old"; Trooper Topp did not recall the response. (*Id*.) The questioning at the passenger side door lasted for one and one half minutes. (Police Video, Def. Ex. A at 3:25:00-3:26:30.) The passenger was respectful, and at no point combative, in his responses to the questions. (Hrg. Tr. 42.) Trooper Topp did not indicate that the passenger seemed nervous in any way. Trooper Topp admitted there is no law in Ohio requiring a passenger in a vehicle to have a driver's license or identification. (*Id*. at 41.)

At 3:26:35 a.m., Trooper Topp returned to the driver's side of the truck and commanded Daugherty to step out of the truck and sit in the police cruiser. (Police Video, Def. Ex. A. at 3:26:35; Hrg. Tr. 11, 44-45.) As Daugherty exited the truck, Trooper Topp asked him if he always drove this late. Trooper Topp indicated that he brought Daugherty back to his cruiser because it was often hard to smell alcohol from outside a vehicle on the side of the road. (Hrg. Tr. 47.) He also stated that it was his practice to bring people he suspects may be under the influence of alcohol or drugs back to his cruiser to "talk to them, do a little more investigation, if they have had anything to drink or any type of illegal drug." (*Id*. at 47.) Daugherty complied and sat in the front passenger seat of the cruiser. Trooper Topp found that at times, Daugherty was difficult to understand, and that Daugherty appeared to be

hard of hearing. (*Id.* at 32.) However, Trooper Topp did not think Daugherty was under the influence of alcohol. (*Id*. at 39.)

Inside the cruiser, at approximately 3:27 a.m., Trooper Topp began questioning Daugherty. The questioning continued for approximately six minutes. (Police Video, Def. Ex. A, 3:27:37 to 3:33:54.) Trooper Topp asked Daugherty a series of questions: What he was doing in Cleveland? Why did he go to Cleveland? What part of Cleveland had he been in? How did he know his passenger? Did his passenger have anything with him? (*Id*.; Hrg. Tr. 11-12, 14.) Daugherty informed Trooper Topp that his passenger had been at a friend's house in Cleveland, that the passenger had paid him $40 to take him, and that Daugherty did not know exactly which part of Cleveland he had been in or what the address was. (*Id*. at 12.) Daugherty indicated he knew the passenger because he used to take the passenger's sister to the grocery store. (*Id*.) Daugherty told Trooper Topp that he had forgotten his passenger's name, that it just didn't stick with him. (*Id*. at 48.) Trooper Topp noted that he found that unusual. (*Id*. at 13.) There is no evidence in the record that Trooper Topp asked Daugherty whether he had consumed any alcohol or drugs that evening. At this point, the time was approximately 3:29 a.m. (*Id.* at 50.)

Trooper Topp then asked if there was anything illegal in the truck, or any drugs in the truck, to which Daugherty responded "not that he knew of." (*Id*. at 13-14.) Trooper Topp continued to ask questions about the passenger, whether he had seen the passenger with illegal drugs, or whether the passenger had anything with him when they went to Cleveland, to which Daugherty responded in the negative. (*Id*. at 14.) Trooper Topp indicated that while asking such questions was "common practice" for him, it was not a standard procedure, and he had not been instructed to do so. (*Id*. at 49.)

At 3:29:40, the audio portion of the videotape malfunctioned and stopped recording. (*Id*. at 52.) When the audio resumed at 3:32:54, Trooper Topp was questioning Daugherty about what he and his passenger were doing in Cleveland, and again asking whether Daugherty knew his passenger's name. (Police Video, Def. Ex. A, 3:32:54.)

During the three minutes without any audio, Trooper Topp admits he was not in the process of writing or issuing a citation to Daugherty. (Hrg. Tr. 51.) Trooper Topp indicated that during this time, he radioed for a drug-detecting canine to be sent to his location. (*Id*. at 57.) He noted that "through talking to the driver, I thought it was extremely odd why they were going to Cleveland, he was being paid, did not know his passenger because of the things that I found out at that time, I thought some – some sort of criminal activity was going on." (*Id*. at 15.)

Trooper Topp left Daugherty in the police cruiser at about 3:34 a.m. and returned to the truck to question the passenger. In response to questioning, the passenger provided Trooper Topp with a home address in Michigan, and informed Trooper Topp that he had a valid driver's license in Michigan, but did not have it with him. (*Id*. at 15-16.) In response to questions about Daugherty, the passenger indicated he had paid Daugherty $50 to take him to Cleveland. (*Id*. at 84.)

At 3:36:39, Trooper Topp returned to the police cruiser and asked the dispatcher to run a check in Michigan and Ohio for the passenger's stated name and birth date. (*Id*. at 17.) No positive identification came back from either state. (*Id*.)

There was no audio on the tape between 3:37 a.m. and when the tape stopped at 3:42 a.m. (*Id*. at 63.)

At some point after the tape ended, at 3:42 a.m., a backup unit arrived, and indicated that the canine unit was unavailable. (*Id*.) At 3:45 a.m.[3], Trooper Topp asked Daugherty for consent to search the truck. (*Id*. at 18, 64-66.) Daugherty consented, but Trooper Topp did not get written consent, because he asserts that his cruiser was out of consent forms. (*Id*. at 18, 66.) During the search, Trooper Topp found an oily rag containing cocaine under the passenger seat. (*Id*. at 19-20.) At 3:52 a.m., Trooper Topp placed the passenger under arrest, and completed his search, finding no additional contraband. (*Id*. at 22, 70.) Trooper Topp instructed Daugherty to follow him back to the Ashland patrol post, where Daugherty was interviewed and subsequently released without charges. (*Id*. at 23-24.)

At the station, the passenger, who Trooper Topp subsequently identified as Defendant Ellis, placed a telephone call using a cordless telephone provided by the police. (*Id*. at 11.) Ellis made incriminating statements in this phone conversation. The conversation was recorded.

Trooper Topp stated that it typically took approximately fifteen minutes to write a citation for weaving. (*Id*. at 37.) There is no record of any citation being written or given to Daugherty, or that Trooper Topp began the process of writing a citation. (*Id*.)

---

[1] The activation of the police cruiser's lights automatically activated a video camera and audio recording system. However, the audio portion of the stop was not fully recorded; it cuts in and out throughout the stop. Additionally, the video tape ran out of space and cut off prior to the end of the stop. (Hrg. Tr. 6-7, 45-46.)

[2] Trooper Topp testified that the time of the stop was 3:25 a.m. or 3:27 a.m. (Hrg. Tr. 8, 64). The video indicated the time of the stop was 3:23 a.m. (Hrg. Tr. 8, 34-36, 40.) There is some dispute over whether the time on the video was accurate. However, for purposes of establishing the length of time between events on the videotape, the court uses and refers to the times on the video unless otherwise specified.

[3] All times after 3:42 a.m. are not from the videotape, but from Trooper Topp's report. Approximately nineteen minutes were recorded on the videotape.

---

II.

Defendant Ellis was indicted by a federal grand jury for possession with intent to distribute 68 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1)/(b)(1)(A). However, following an evidentiary hearing at which Trooper Topp testified, the district court granted Ellis's motion to suppress the evidence seized at the scene of the traffic stop and Ellis's telephone statements. The district court held that the traffic stop search and seizure exceeded the scope of the initial stop and, thus, suppressed all evidence that flowed from it. The government timely appealed.

III.

The grant or denial of a motion to suppress is a mixed question of fact and law. *United States v. Hurst*, 228 F.3d 751, 756 n.1 (6th Cir. 2000). On appeal, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006). A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, "is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). The evidence must be viewed "in the light most likely to support the district court's decision." *Dillard*, 438 F.3d at 680 (internal quotation marks and citations omitted). Finally, "'[w]here there are two permissible views of the evidence' the district court's conclusions 'cannot be clearly erroneous.'" *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

The threshold issue raised by the government is whether Ellis has standing to challenge the search and seizure. To the extent that a defendant's Fourth Amendment standing is a question of law, we review it de novo. *See United States v. Pollard*, 215 F.3d 643, 646 (6th Cir. 2000). In determining that Ellis, the passenger, had standing to challenge the search and seizure, the district court stated:

> [a] passenger in a vehicle ordinarily has no expectation of privacy in the vehicle, and thus does not have standing to challenge the validity of consent given by a driver of the vehicle. *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978). However, courts have distinguished standing to challenge consent from standing to challenge evidence discovered as fruit of an unlawful detention.

We agree. Although a passenger does not have a legitimate expectation of privacy in the searched vehicle, "as a passenger [a defendant] may still challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity." *United States v. Jones*, 374 F. Supp. 2d 143, 154 (D.D.C. 2005) (quoting *United States v. Ameling*, 328 F.3d 443, 447 n.3 (8th Cir. 2003)) (internal quotation marks omitted). Consistent with the district court's ruling on this issue, the Supreme Court recently held in *Brendlin v. California*, – U.S. –, 127 S. Ct. 2400 (decided June 18, 2007), that a passenger of a motor vehicle possesses the same standing of the driver to challenge the constitutionality of a traffic stop.

For these reasons, Ellis possesses standing to challenge his alleged unlawful seizure and the evidence that flowed from the search and seizure.

IV.

The pivotal issue is whether, under these circumstances, the scope and duration of the detention transformed this legal traffic stop into an unconstitutional seizure. It is undisputed that the initial stop was constitutional because Topp possessed probable cause to believe that a traffic violation occurred. However, the district court ruled that insufficient reasonable suspicion of criminal activity existed to justify the overall detention of twenty-two minutes. We disagree.

Any analysis of a claimed Fourth Amendment violation must focus on the objective reasonableness of the police officer's actions, not a bright-line rule, "in recognition of the 'endless variations in the facts and circumstances' implicating the Fourth Amendment." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Royer*, 460 U.S. 491, 506 (1983)). "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). A lawful traffic stop "may become an impermissible 'seizure if it occurs over an unreasonable period of time or under unreasonable

circumstances.'" *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *United States v. Orsolini*, 300 F.3d 724, 729-30 (6th Cir. 2002)). *Cf. United States v. Guimond*, 116 F.3d 166 (6th Cir. 1997).

"Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *See United States v. Perez*, 440 F.3d 363, 372 (6th Cir. 2006) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)). Reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266 (2002) (citations omitted) (holding that a combination of suspicious factors, including a van traveling on a known smuggling route in a remote area, the driver slowing down upon noticing the officer, and the passengers possibly concealing cargo by having their knees raised, all gave rise to reasonable suspicion). The totality of the circumstances analysis permits police officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002).

Recently, in *United States v. Garrido*, 467 F.3d 971 (6th Cir. 2006), we upheld, as constitutional, an hour-long safety inspection of a vehicle following a lawful traffic stop. First, we surveyed our previous decisions in this area:

> *Compare United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004) (concluding that the motorists' nervousness, their allegedly conflicting explanations of travel plans, and the movement of one from the back to the driver's seat did not suffice to create a reasonable suspicion); [*United States v.*] *Townsend*, 305 F.3d [537] at 542-45 (finding that ten factors, including dubious travel plans, three cell phones in the car, and the driver's history of weapons offenses, did not rise to the level of a reasonable suspicion); *and* [*United States v.*] *Smith*, 263 F.3d [571] at 588-94 (concluding that nine factors, including the stoned appearance of one vehicle occupant, food wrappers in the car, and the nervousness of the occupants, did not establish a reasonable suspicion); *with United States v. Davis*, 430 F.3d 345, 355-56 (6th Cir. 2005) (holding that a driver's meeting with a known drug dealer justified continued detention until a drug-sniffing dog could arrive, but that additional detention after the dog failed to alert was unreasonable); [*United States v.*] *Hill*, 195 F.3d [258] at 270-73 (concluding that eight factors, including a dubious explanation for a cross-country trip, nervousness, and the cash rental of a U-Haul, justified continued detention); *and United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) (holding that eight factors, including the lack of registration and any proof of insurance, and the nervousness and criminal record of drug violations of the driver, sufficed to justify continued detention).

*Garrido*, 467 F.3d at 982. Then, we analyzed the eight factors relied upon by the government for establishing reasonable suspicion for the hour-long seizure. Although each factor was innocuous, separately, we held that their combination, in total, amounted to reasonable suspicion of criminal activity. *Garrido*, 467 F.3d at 983-84.

In the present case, the seizure prior to the consent to search was not prolonged, but lasted only twenty-two minutes. A large portion of this detention was necessitated by the purpose of the initial stop and the need for the trooper to identify the occupants of the vehicle and determine the driver's ability to safely operate the vehicle. In obtaining the driver's driving license and vehicle registration, Trooper Topp was justified in asking the occupants general questions of who, what, where, and why regarding their 3:23 a.m. travel. *United States v. Hill*, 195 F.3d at 268; *United*

*States v. Erwin*, 155 F.3d at 822-23.[1] Topp's inquiries and his actions necessitated by the suspected traffic violation lasted only thirteen minutes and thirty-nine seconds (3:23 to 3:36:39). During this time, defendant Ellis gave Trooper Topp a false alias that Topp was unable to confirm.

Thereafter, reasonable suspicion existed for the further brief detention of an additional eight minutes and twenty-one seconds (3:36:39 to 3:45) based on the combination of the following factors: (1) Trooper Topp's inability to confirm Ellis's false alias; (2) Daugherty's response of "not that he knew of" to Topp's question of whether the vehicle contained drugs or anything illegal; (3) Daugherty's lack of knowledge of defendant's name; (4) Daugherty's lack of knowledge where he had been in Cleveland; (5) Ellis's lack of knowledge of his social security number; and (6) the discrepancy regarding how much money Ellis paid Daugherty for the trip. While a prolonged detention may not have been justified, we conclude that, under these circumstances, the additional detention of eight minutes and twenty-one seconds for further investigation of Trooper Topp's reasonable suspicions was lawful and not a violation of defendant's Fourth Amendment right to be protected "against *unreasonable* searches and seizures." U.S. CONST. amend. IV (emphasis added).

Ultimately, we "must be mindful of the police officer's duty to conduct the stop with the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," *Hill*, 195 F.3d at 270 (citations omitted). But in this case, like *Hill*, we conclude that the brief detention was a reasonable response to the totality of the circumstances. *See also United States v. Bradshaw*, 102 F.3d 204, 212 & n.18 (6th Cir. 1996). In forming his reasonable suspicions, Trooper Topp "was entitled to assess the circumstances and defendants in light of his experience as a police officer and his knowledge of drug courier activity." *Hill*, 195 F.3d at 270 (citing *United States v. Cortez*, 449 U.S. 411, 416 (1981)). A totality of the circumstances analysis prohibits us from discounting certain factors merely because, separately, they could potentially have "an innocent explanation." *United States v. Arvizu*, 534 U.S. at 267.

For these reasons, we hold that, given the totality of the circumstances, the scope and duration of the detention did not transform this legal traffic stop into an unconstitutional seizure.

V.

Finally, the government argues that the district court erred by suppressing the rag containing cocaine and defendant's incriminating telephone statements as the fruits of an unlawful seizure. We agree. Because this lawful traffic stop did not evolve into an unconstitutional seizure, the cocaine evidence and defendant's post-arrest statements did not flow from a Fourth Amendment violation.

VI.

For these reasons, we reverse the order of the district court and remand for further proceedings consistent with this opinion.

---

[1] *See also United States v. Potts*, 173 F.3d 430, 1999 WL 96756 at *4 (unpublished) (6th Cir. 1999) ("It is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop.").