RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0326p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 06-6003

TALMADGE CODY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 04-00014—J. Ronnie Greer, District Judge.

Argued: July 26, 2007

Decided and Filed: August 16, 2007

Before: DAUGHTREY and GILMAN, Circuit Judges; ADAMS, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** David M. Eldridge, ELDRIDGE & BLAKNEY, Knoxville, Tennessee, for Appellant.
Robert M. Reeves, ASSISTANT UNITED STATES ATTORNEY, Greeneville, Tennessee, for
Appellee. **ON BRIEF:** David M. Eldridge, ELDRIDGE & BLAKNEY, Knoxville, Tennessee, for
Appellant. Robert M. Reeves, ASSISTANT UNITED STATES ATTORNEY, Greeneville,
Tennessee, for Appellee.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. A federal jury convicted Talmadge Cody on four
counts of a six-count indictment relating to his role in two robberies committed in Greene County,
Tennessee in February of 2004. Prior to his trial, Cody had moved to sever two "prejudicially
joined" counts of the indictment that charged him with escaping from the custody of the Greene
County Sheriff's Department following his arrest. He had also moved to dismiss two other counts
relating to one of the robberies on the ground that the government had lost or destroyed relevant,
potentially exculpatory evidence. Finally, he had filed a motion to suppress the in-custody
statements that he had made to the investigating officers on the ground that his expressed suicidal
ideations at the time rendered those statements involuntary.

_____

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by
designation.

1

The district court denied all three of Cody's pretrial motions. Cody challenges each of these denials on appeal, as well as three additional adverse evidentiary rulings made by the district court during the course of the trial. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.     Factual background

This case concerns two armed robberies that occurred in Greene County, Tennessee over the course of a three-day period in mid-February of 2004. The first, a relatively small-scale, multi-hundred-dollar heist at the Hurdy Gurdy Video Store on February 15, was followed by a larger, multi-thousand-dollar robbery at the Greene County Bank on February 18. Approximately one week later, officers from the Greene County Sheriff's Department arrested Cody as a suspect. They would later arrest both his wife, Linda, and his then-20-year-old son, Marshall.

Following his arrest, Cody made several statements while in the custody of the Sheriff's Department concerning his role in the crimes. He was transferred to a local hospital after complaining of chest pains in mid-March of 2004. But he escaped two days after the transfer, assaulting and seriously injuring several hospital employees and a corrections officer in the process.

Cody was arrested approximately 15 hours after he had escaped. Officers found him hiding in the back seat of his son's sport-utility vehicle, where they also discovered the semiautomatic pistol that he had taken from the corrections officer during his escape. Marshall, who was also arrested at the time, subsequently gave a statement to an agent of the Federal Bureau of Investigation regarding his role in his father's escape from the hospital.

### B.     Procedural background

The government charged Cody in a six-count indictment with (1) robbery of the Greene County Bank, (2) carrying, using, and brandishing an assault rifle during the commission of that robbery, (3) aiding and abetting his wife in the commission of the Hurdy Gurdy Video robbery, (4) aiding and abetting his wife in carrying and using a firearm during the commission of that robbery, (5) escape from custody, and (6) carrying and using a firearm during the escape. (His wife and his son, who were separately indicted, have since pled guilty, with Linda being sentenced to 215 months in prison and Marshall to 48 months of probation.)

Cody's first trial lasted a single day in February of 2005 and, following less than an hour of jury deliberations, ended in convictions on all counts. With the aid of new counsel, Cody subsequently filed a timely motion for a new trial. He presented numerous grounds in support of his motion, most notably the admission at trial of an unredacted order of detention relating to his escape that included prejudicial findings by the assigned federal magistrate judge. Following a hearing, the district court granted Cody's motion on this ground.

Cody filed three motions prior to his new trial. He first moved to sever the escape-related counts of the indictment on the ground that they had been improperly and prejudicially joined with the robbery counts in violation of Rules 8 and 14 of the Federal Rules of Criminal Procedure. Cody next moved to dismiss the first two counts of the indictment on the ground of lost or destroyed relevant, potentially exculpatory evidence—specifically, videotapes from a convenience store that the government had ultimately deemed irrelevant after a promising lead had proven false. Finally, Cody moved to suppress what he claimed to have been involuntary statements that he made while in the custody of the Greene County Sheriff's Department. The district court denied all three of these motions.

At trial, Cody opted not to present any witnesses, instead moving for a judgment of acquittal on all counts following the government's case. The district court granted Cody's motion as to the fourth count only (aiding and abetting his wife in carrying and using a firearm during the commission of the Hurdy Gurdy Video robbery). Subsequently, the jury found Cody guilty on counts one, two, five, and six of the indictment, but not guilty on count three (aiding and abetting his wife in the commission of the Hurdy Gurdy Video robbery). He was sentenced to 490 months in prison. Cody timely appeals his convictions; he does not challenge his sentence.

## II.  ANALYSIS

### A.        Standard of review

We review a district court's denial of a motion to sever under the abuse-of-discretion standard. *United States v. Smith*, 197 F.3d 225, 230 (6th Cir. 1999). Regarding the denial of Cody's motion to suppress, we will not set aside the district court's factual findings unless we find them to be clearly erroneous, and we review its legal conclusions de novo. *See United States v. Graham*, 483 F.3d 431, 435 (6th Cir. 2007). In doing so, we view the evidence in the light most favorable to the district court's conclusion. *Id.* We also review de novo a district court's denial of a motion to dismiss an indictment on the ground of lost or destroyed exculpatory evidence. *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001). Finally, we review a district court's evidentiary rulings under the abuse-of-discretion standard. *United States v. Jones*, 403 F.3d 817, 820 (6th Cir. 2005).

### B.        Motion to sever

Cody first argues that the district court abused its discretion in denying his motion to sever what he characterizes as the "prejudicially joined" escape-related counts of the indictment. Rules 8 and 14 of the Federal Rules of Criminal Procedure govern the joinder and severance of the counts of an indictment, respectively. Rule 8 provides in pertinent part that the joinder of offenses is permissible where they are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "Although this court has held that Rule 8 should be construed in favor of joinder, it is also true that failure to meet the requirements of this rule constitutes misjoinder as a matter of law." *United States v. Chavis*, 296 F.3d 450, 456 (6th Cir. 2002) (quotation marks omitted).

If the requirements of Rule 8 are not met, "the district court has no discretion on the question of severance." *Id.* (quotation marks omitted). And even if joinder in a given case does comply with Rule 8, Rule 14 provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

Cody's claim of misjoinder is premised on his allegation that "[t]he only relationship between the 4 robbery related counts and the escape counts is that Mr. Cody was in custody for the robbery counts at the time of the escape." In support of this allegation, he emphasizes the differences in (1) the number of people involved in the robbery counts as opposed to the escape counts (Cody and his wife versus Cody alone), and (2) the time gap between the events that formed the basis for each set of counts (four-and-a-half weeks). He also claims that the district court necessarily accepted his misjoinder argument, at least in part, by ordering a new trial.

Cody emphasizes that the district court based its new-trial ruling on "the introduction at trial of the entire order of detention entered pre-trial by the United States Magistrate Judge." In the court's opinion, certain statements made by the magistrate judge in the order "would [have] be[en] highly suggestive to any reasonable jury that the defendant was not only guilty of committing crimes of violence but that he would also not hesitate to assault a police officer in an effort to escape from lawful custody." Specifically, the court mentioned the magistrate judge's comment that "defendants

had fatalistic attitudes and would have welcomed a shoot-out with police." Nowhere in the district court's opinion, however, is there any indication that the court believed that the joinder of the charges itself had been prejudicial to Cody.

Although Cody's arguments on the merits of the misjoinder issue are reasonably debatable, we need not address them. This court has adhered to Supreme Court precedent in holding that a determination of misjoinder is subject to harmless-error review under Rule 52(a) of the Federal Rules of Criminal Procedure, which permits reversal only for trial errors that "affect substantial rights." *See Chavis*, 296 F.3d at 461 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)). Error based on misjoinder is almost always harmless where, as here, the trial court issues a careful limiting instruction to the jury on the issue of possible prejudice resulting from the joinder. *See Chavis*, 296 F.3d at 461 (resting its harmless-error-based affirmance principally on the fact that "[t]he Supreme Court has instructed . . . that the danger of prejudice resulting from improper propensity inferences can be reduced significantly by proper curative instructions" (citing *Lane*, 474 U.S. at 450 n.13)).

Prejudicial joinder is particularly unlikely "where it would not have been difficult for the jury to compartmentalize and distinguish the evidence concerning the different offenses charged." *Chavis*, 296 F.3d at 462 (quotation marks omitted); *see also United States v. Frost*, 125 F.3d 346, 391 (6th Cir. 1997) ("The District Court further minimized any prejudice by instructing the jury to consider only the evidence against each defendant on each charge . . . without regard to the other charges or defendants."). We will therefore assume without deciding that the joinder in this case was improper, and move directly to the issue of harmlessness. *See, e.g.*, *United States v. Demjanjuk*, 367 F.3d 623, 632 (6th Cir. 2004) (noting that "we need not decide whether the district court's ruling was erroneous or whether this is a reviewable issue because if any error occurred it was harmless") (brackets omitted).

In the present case, the district court issued the following limiting instruction to the jury at the close of the evidence:

> The defendant has been charged with multiple crimes. The number of charges is no evidence of guilt and this should not influence your decision in any way. It is your duty to separately consider the evidence that relates to each charge and to return a separate verdict for each one. For each charge you must decide whether the government has presented proof beyond a reasonable doubt that the defendant is guilty of that particular charge. Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any of the other charges.

This instruction is virtually identical to the one that this court deemed sufficient to overcome the prejudicial effect of the improper joinder in *Chavis*. 296 F.3d at 462. In addition, "*Lane* instructs that we should presume that the jury followed this instruction and did not make an improper propensity inference." *Id.*

The jury's acquittal of Cody on count three of the indictment (aiding and abetting his wife in the commission of the Hurdy Gurdy Video robbery), moreover, is proof that the jury was, in fact, able "to compartmentalize and distinguish the evidence concerning the different offenses charged." *See id.* (quotation marks omitted); *see also id.* (citing the defendant's acquittal on a possession-with-intent charge as "support for the conclusion that [the jury] did not label [the defendant] as a 'drug dealer' based upon his involvement in [a separate firearm offense]"); *United States v. Hubbard*, 61 F.3d 1261, 1272 (7th Cir. 1995) ("[T]he fact that the jury convicted Hubbard on the weapons offense but could not reach a verdict on the two narcotics charges suggests, if anything, that the jury was quite able to separate the firearms count from the narcotics counts and deliberate each with the appropriate evidence and legal criteria in mind."); *United States v. Bibby*, 752 F.2d 1116, 1122 (6th Cir. 1985) (citing acquittal on misjoined charges as evidence that the defendant was not prejudiced

by the joinder). We therefore conclude that the joinder of the escape-related counts with the robbery-related counts of the indictment against Cody, even if improper, was harmless.

## C.      Motion to suppress

Cody next argues that the district court erred in denying his motion to suppress the statements that he had made while in the custody of the Greene County Sheriff's Department following his arrest. But his argument—namely, that his statements were not "voluntary" in light of the suicidal tendencies that he was experiencing, and that he voiced, at the time—is squarely foreclosed by Supreme Court precedent. The Court considered a similar argument in *Colorado v. Connelly*, 479 U.S. 157, 164 (1986), where it explicitly declined to hold that "a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" Instead, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Id.* at 167. Cody, however, does not allege that the officers who interviewed him coerced him in any way. We therefore affirm the district court's judgment denying Cody's motion to suppress his custodial statements.

## D.      Motion to dismiss

Cody also argues that the district court erred in denying his motion to dismiss counts one and two of the indictment on the ground of lost or destroyed exculpatory evidence. In support of this motion, Cody pointed out that the Greene County officers had collected two videotapes from a convenience store's surveillance cameras with the hope that they would help to reveal the identity of the Greene County Bank robbers. But, Cody complains, "[t]hese video tapes were not logged into evidence and at the time of trial could not be located." The officers who testified at the hearing on Cody's motion did not dispute his factual allegations, but explained the absence of the tapes on the ground that they "were not considered to be of any evidentiary value." Specifically, the sole impetus for obtaining the tapes in the first place was that the convenience store had deposited some dye-stained money at another bank shortly after the Greene County Bank robbery. But, as Captain Huffine testified, the evidentiary value of the deposited money "diminished as . . . soon as we found out it wasn't associated with the [dye-stained] bait money [used by the Greene County Bank]."

Cody concedes that the exculpatory value of the tapes is unknown—that is, only "potentially useful" at best. He must therefore show that the officers acted in bad faith in failing to preserve them. *See Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) (holding that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). The Court in *Youngblood* contrasted this standard with the comparatively lighter burden of proof on the accused in cases where the undisclosed evidence at issue is "material" and "exculpatory," and "the good or bad faith of the State [is] irrelevant" to the analysis. *Id.*

Cody's attempt to show bad faith consists entirely of his assertion that "[l]aw enforcement made a conscious choice to disregard evidence that they once presumed valuable without an examination of that evidence." Although Cody's contention is factually accurate, he fails to mention that the reason why the officers disregarded the evidence was their good-faith belief that it had no relevance or value whatsoever to their investigation of the robberies. At the very least, the district court's acceptance of this rationale was not clearly erroneous. *See United States v. Smith*, No. 94-6071, 1995 WL 399060, at *1 (6th Cir. July 6, 1995) ("A district court's conclusion that the government did not destroy potentially useful evidence in bad faith is a finding of fact that is subject to reversal only for clear error."); *United States v. Ellis*, — F.3d —, —, 2007 WL 2239196, at *4 (6th Cir. Aug. 7, 2007) ("On appeal, we review the district court's findings of fact for clear error

. . . .").  We therefore affirm the judgment of the district court denying Cody's motion to dismiss counts one and two of the indictment.

## E.        Evidentiary objections

Finally, Cody argues that the district court made erroneous evidentiary rulings on three separate occasions, each of which we will address in turn.  His first such contention is that the court abused its discretion in granting the government's request to have Cody stand up in open court for identification purposes.  The government responds that the identification, which occurred during its redirect examination of bank teller Amy Luttrell, had been invited by defense counsel when he "opened the door" while cross-examining Luttrell about Cody's physical build.

In *United States v. Young*, 470 U.S. 1, 11-13 (1985), the Supreme Court outlined the contours of what has become known as the "invited response" or "invited reply" doctrine.  The doctrine takes its name from "an all too common occurrence in criminal trials—the defense counsel argues improperly, provoking the prosecutor to respond in kind, and the trial judge takes no corrective action."  *Id.* at 11.  We recognize that the doctrine is therefore technically inapplicable in the present case, where there is no allegation that defense counsel's questioning of Luttrell, as an initial matter, was improper.  *Cf. United States v. Campbell*, Nos. 98-1782/2174, 2000 WL 1597858 (6th Cir. Oct. 19, 2000) (Clay, J., concurring in part and dissenting in part) (insisting that the doctrine "only comes into play if a defense counsel improperly attacks the prosecutor's integrity").

The government, presumably for this reason, does not explicitly invoke the doctrine in its brief.  But the doctrine is instructive in that, as the Supreme Court clarified in *Young*, the inquiry does not end upon a determination that a particular response was or was not invited, but additionally demands that the response's effect "be examined within the context of the trial."  470 U.S. at 12; *see also id.* ("[T]he issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant.").

In the present case, defense counsel cross-examined Luttrell, a Greene County Bank teller at the time of the second robbery, solely to evoke her initial description of the male robber as having had "a medium build."  Defense counsel asked whether the police officer to whom Luttrell gave her description had "wanted you to describe the man's weight and . . . his build," and whether she had "wanted to be as accurate as you could in answering his questions."  She answered both questions "yes."  The actual in-court identification subsequently took place on redirect examination as follows: Cody stood up, Luttrell looked at him, and she stated that "I wouldn't describe him as large, and I wouldn't describe him as small, so I guess medium."

Cody argues that this identification was both irrelevant and unduly prejudicial because it "implies that after more than two years in jail that not only does Mr. Cody have the same build he had two years prior, but also that his build was consistent with that of the perpetrator of the Greene County robbery."  But, as the government points out in its brief, the jurors saw the surveillance video and related still-frame pictures of the bank robbery and therefore were able to decide for themselves whether Cody's build had changed over the course of two years.

Although Cody correctly notes that "[t]he perpetrators of the robbery were disguised in motorcycle helmets and jackets so that no distinguishing features were visible," a person's physical "build" is a feature that can be ascertained despite the presence of disguises, especially when it is described at so high a level of generality as "small," "medium," or "large."  We therefore conclude that the district court did not abuse its discretion in allowing Luttrell to identify a standing-up Cody in open court, especially in light of the weight of the other evidence against him.  *See Young*, 470 U.S. at 11-12 (emphasizing that the invited-response doctrine is "no more than an application of

settled law" in that a reviewing court must still examine the response "within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error").

Cody's next evidentiary argument is that the district court abused its discretion in admitting the testimony of his wife and his son regarding the family's drug use and, specifically, Cody's drug dealer and close friend "Trey." Linda testified that, among other things, the motive for the bank robbery was to acquire money to help her and Cody purchase more drugs, especially crack cocaine, and to pay off debts that they owed to Trey. Motive, of course, is one of the purposes for which evidence of other wrongs is generally admissible, *see* Fed. R. Evid. 404(b), and Cody does not dispute the truth of Linda's testimony. Nor can the prejudicial effect of her testimony, if any, be said to "substantially outweigh" its probative value, given that Cody's drug habits were "inextricably intertwined with the bank robbery," as the government aptly argues, and thus extremely probative of motive. *See* Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). We therefore find no error in the admission of Linda's testimony.

Regarding Marshall's testimony about Trey, Cody objected to its admission solely on the basis of relevance. But Marshall testified that Cody had gone to Trey's house immediately following his escape to get a change of clothes, which raises an inference that Trey had been involved in planning the escape. Marshall's testimony was therefore relevant in that it had at least some "tendency to make the existence of [Cody's escape] more probable . . . than it would [have] be[en] without the [testimony]." *See* Fed. R. Evid. 401 (defining the term "relevant evidence"). The district court accordingly did not abuse its discretion in overruling Cody's objection to this specific portion of Marshall's testimony.

Cody's final assignment of evidentiary error concerns the district court's admission of the portion of his audiotaped interview with the Greene County Sheriff's Department in which he expresses a desire to commit suicide. The court justified its decision by characterizing Cody's suicide-related statements as an admission of guilt. Specifically, the court noted that "he says here [on the tape] that he couldn't live in prison, so he was going to kill himself, which is itself an admission." The government elaborates in its brief that, "[i]n the context of defendant's interview with the officers, defendant's thoughts of suicide were in response to his admission of guilt and his consideration of the potential ramifications for committing the robberies." Apart from invoking basic evidentiary concepts such as relevance and Rule 403 probativeness-versus-prejudice balancing, Cody fails to seriously dispute this admission-of-guilt rationale.

This court has never addressed the specific question of whether suicidal ideations and/or attempts are admissible as evidence of consciousness of guilt. But this court has repeatedly addressed the same general question in the roughly analogous context of a defendant's flight from the scene of a crime, employing the following four-step analysis to determine its probative value:

> [T]he probative value of flight evidence depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*United States v. Atchley*, 474 F.3d 840, 853 (6th Cir. 2007) (quotation marks omitted). Applying this analysis to Cody's in-custody statements about suicide is a logical extension of long-accepted rules of evidence that treat suicide as a form of flight. *See Tug Raven v. Trexler*, 419 F.2d 536, 543 (4th Cir. 1969) ("Under generally accepted rules of evidence flight after the commission of a criminal act constitutes circumstantial evidence of consciousness of guilt and suicide is a form of

flight." (citing 2 Wigmore, *Evidence* § 276 (3d ed. 1940), and McCormick, *Law of Evidence* § 248 (1954))).

We therefore hold that suicidal ideations and/or attempts may be admissible as relevant evidence of consciousness of guilt, but only after being screened through typical Rule 403 balancing in accordance with this court's jurisprudence on the admissibility of flight evidence. *See* 2 Kenneth S. Brown et al., *McCormick on Evidence* § 263 (6th ed. 2006) ("Critical scrutiny of the balance between the often weak probative value of this type of evidence [of flight] and its prejudicial impact is appropriate in each case.").

In the present case, Cody made his statements about suicide while in the custody of the Greene County Sheriff's Department. He had been brought directly from his jail cell to the criminal-investigation office, where three officers interviewed him. Exactly what Cody said is unclear because the trial transcript omits the contents of the audiotape that the government played for the jury, instead simply indicating "(CD PLAYING)." The government fills this gap by noting in its brief that, "[d]uring the interview, defendant states that he has considered suicide as an alternative to going to prison for what he has done." Assuming that this is an accurate representation—and given Cody's failure to file a reply brief, we will treat it as such—then the "probative value" of the statement ranks fairly high under the four-factor standard from *Atchley* quoted above. The words "for what he has done," after all, could reasonably be interpreted to satisfy the fourth inference: "from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *Atchley*, 474 F.3d at 853.

Nor was the admission of Cody's suicide-related statements unduly prejudicial in comparison to its probative value. *See* Fed. R. Evid. 403. In fact, Cody gives no indication whatsoever in his brief as to *why* the statements had "a prejudicial impact on the jury," as he conclusorily argues. The only such indication appears in the trial transcript, where Cody's attorney objected to the admission of the statements because of "the potential for the jury to draw some inference that he is psychologically impaired, or some other speculation that is simply not relevant." But even if the jury had inferred from Cody's words that he was psychologically impaired, we fail to understand how that inference necessarily would have prejudiced the jury *against* him. It might equally have made him appear to be a more sympathetic character.

In any event, that lone inference does not "substantially outweigh" the statements' probative value as discussed above. To be sure, psychological impairment could have made the second probativeness inference—namely, from suicidal ideations to consciousness of guilt—more difficult to establish. But the government's assertion that "defendant states [during the interview] that he has considered suicide as an alternative to going to prison for what he has done," an assertion that we have already assumed to be accurate, contradicts a finding that Cody was in fact psychologically impaired. We therefore conclude that the district court did not abuse its discretion in overruling Cody's objection and allowing the government to play the audiotape of his interview with the Greene County Sheriff's Department to the jury.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.