# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 24, 2009 Session

## STATE OF TENNESSEE v. KEVIN ALLEN GENTRY

**Direct Appeal from the Circuit Court for Sevier County**
**No. 10704-II     Richard R. Vance, Judge**

---

**No. E2008-02226-CCA-R3-CD - Filed February 3, 2010**

---

A Sevier County Criminal Court Jury convicted the appellant, Kevin Allen Gentry, of one count of rape of a child. Following the conviction, the trial court imposed a sentence of twenty-five years in the Tennessee Department of Correction. On appeal, the appellant contends that the trial court erred in admitting an audiotaped message recorded by the appellant, arguing that the statements on the tape were not relevant to the issues at trial, or, in the alternative, were overly prejudicial. Upon review, we conclude that there is no reversible error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Brent O. Horst, Nashville, Tennessee, for the appellant, Kevin Allen Gentry.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James B. Dunn, District Attorney General; and Jeremy D. Ball, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On January 25, 2005, the Sevier County Grand Jury issued a presentment charging the appellant with rape of a child, namely T.C.[1] The State's first witness at trial, Carol Cox, the victim's mother, testified that the victim was born on June 30, 1994. Cox met the

---

[1]  It is the policy of this court to refer to minor victims of sexual crimes by their initials.

appellant when he helped her husband with a roofing job. Through her acquaintance with the appellant, Cox met the appellant's live-in girlfriend, A.H. Cox said that the appellant was in his thirties and that she was told A.H. was seventeen years old. Believing A.H. was old enough to supervise the victim, Cox allowed the then nine-year-old victim to go to the appellant's mobile home five to ten times for A.H. to babysit her.

Cox said she made the victim stop going when she learned A.H.'s "real age" and when her "mother's instinct" told her that something was not right. Cox stated that thereafter, the victim's attitude changed for the worse and her grades plummeted. Around September 2004, Cox's oldest daughter told Cox that the appellant had inappropriately touched the victim. Cox talked with the victim about the accusation, and they went to the authorities.

After the appellant was charged with raping the victim, Cox found fliers posted around her neighborhood. The fliers advertised a "[f]ive thousand dollar reward for information leading to the proof of the false charges against" the appellant. Cox called the telephone number on the fliers and told the person who answered that she was the victim's mother and that she intended to take the fliers to the district attorney's office. Cox denied telling the appellant's family that she would make the charges go away if she were paid $10,000. Cox asserted that the appellant "couldn't pay me a million dollars to let this go." Additionally, Cox denied that she ever sold marijuana to A.H.

The victim testified that during the summer of 2003, she was nine years old, the appellant was approximately thirty-two years old, and A.H. was fourteen or fifteen years old. The victim said that the appellant and A.H. told Cox that A.H. was seventeen years old. The victim asserted that the appellant knew her age because "[h]e asked me my age and then I said nine."

The victim said that A.H. babysat her at the appellant's mobile home five to ten times that summer and that she spent the night around seven times. The victim maintained that on the occasions she spent the night at the appellant's mobile home, the appellant touched her inappropriately. The victim said A.H. was always present when the inappropriate touching occurred.

The victim said that when she spent the night with the appellant, she, the appellant, and A.H. would go to the appellant's bedroom to watch movies. The victim said the appellant would give her alcohol and then touch her breasts and genitals. She said the appellant digitally penetrated her vagina and also penetrated her vagina and anus with his penis. The victim said that at the appellant's behest, A.H. performed oral sex on the victim while the appellant and A.H. had sex. The appellant told the victim not to tell anyone because both he and the victim would get into trouble.

The victim said that after the appellant molested her, her attitude became poor and her grades fell. She told her cousin about the appellant molesting her, but she did not tell her mother. Nevertheless, Cox found out about the molestation approximately seven and a half to eight months later, and she took the victim to a doctor for an examination.

On cross-examination, the victim acknowledged she reported the molestation in September 2004, after she was called to the principal's office for kissing a boy at school. She admitted that her father did not like her kissing the boy, but she denied that her father punished her for it. The victim stated that she did not recall telling a nurse that the penetration did not hurt, maintaining "[i]t did hurt."

Also on cross-examination, the victim said that during the summer of 2003, she went to the appellant's residence almost every day. Upon further questioning, she said that she went five to ten times. The victim acknowledged that she told Detective Cubberly she was "raped just about every time" she went to the appellant's residence.

Gail Clift, a pediatric nurse practitioner and sexual assault nurse examiner, testified that she was an employee of Childhelp. On October 5, 2004, after receiving a referral from the Department of Children's Services, she examined the victim. She said the victim was generally healthy with no physical complaints other than vaginal discharge. Clift noted that the victim's school performance had recently declined and that she had minor behavioral difficulties at home.

Clift said that during an interview, the victim

> disclosed to me that [the appellant] had touched her private parts with his front private part on the inside, had touched her front private part with his hand on the inside, that he had licked her front private part on the inside, that he had put his private part in her butt on the inside, that he had touched her breast with his hand, and that he had kissed her on the mouth.

Clift said that she did not find any tears during her physical examination of the victim's genitals. Clift said that an absence of tearing was not unusual, explaining that the victim was starting puberty and that the tissue in her genital area was stretchy and elastic. Clift said that because of the elasticity of the tissue, penetration would not necessarily cause injury. Additionally, Clift said that children's injuries generally heal very quickly, within three to four days. She maintained that due to the victim's age and the changes of puberty, an injury to the hymen could be difficult to detect. Clift opined that the victim's allegations were consistent with her medical findings.

On cross-examination, Clift stated that only three findings were definitive indicators of sexual abuse: (1) a tear or disruption in the hymen, (2) a sexually transmitted disease, and (3) pregnancy. Clift said that the victim did not exhibit any of the definitive indicators of sexual abuse. However, she noted that vaginal discharge "can occur in children who have been sexually abused."

Detective Matthew Cubberly of the Sevier County Sheriff's Department testified that on September 28, 2004, Cox contacted him with the complaint that the appellant had sexually abused the victim. Detective Cubberly began investigating the appellant. On January 25, 2005, the Sevier County Grand Jury issued a presentment against the appellant, and on February 7, 2005, a capias was served on him. Thereafter, the appellant was scheduled to appear in court in Sevier County; however, he failed to appear on the scheduled date. Later, the Nags Head, North Carolina Police Department sent Detective Cubberly an audiotape recorded by the appellant, on which he detailed his plan to commit suicide. Detective Cubberly observed that the appellant's appearance at trial was different than it was at the time the detective served the capias.

Thomas Gilliam testified that he was a lieutenant with the Nags Head Police Department. Lieutenant Gilliam said that Nags Head was "on a chain of barrier islands off the coast of North Carolina" and was 600 to 700 miles from Sevier County. Lieutenant Gilliam said that on April 23, 2005, he was patrolling a subdivision near the beach on the southern end of Nags Head when he saw a white Pontiac Firebird parked in the sand off the side of the road. Lieutenant Gilliam believed the vehicle was parked in an unusual manner, and he "ran" the license plate. Discovering nothing untoward, Lieutenant Gilliam left.

The following evening, the communications division advised Lieutenant Gilliam of a "delayed hit on the vehicle," which indicated the vehicle belonged to a suspected missing person. Lieutenant Gilliam returned to the vehicle and shined a light in the vehicle. He observed that the vehicle was locked, the keys were in the ignition, and the vehicle contained several items. A back-up officer arrived and used a device to open the door of the vehicle. Upon a search of the vehicle, Lieutenant Gilliam found several items, including an envelope which was lying on the front passenger seat. On the envelope was written, "For my mom and family, Patricia Gentry," along with a telephone number for Patricia Gentry. Lieutenant Gilliam called the telephone number and notified the appellant's mother of his apparent suicide.

Kevin Brinkley testified that he was a lieutenant with the Nags Head Police Department. Lieutenant Brinkley said he was notified that a vehicle associated with a missing person had been found. Lieutenant Brinkley did an inventory of the appellant's vehicle, finding one pair of blue jeans; two socks; a pair of black boots; a K-Mart bag containing an empty box which had held a pair of ten-pound ankle weights; a receipt dated

April 12, 2005 for the purchase of the weights; an April 12, 2005, receipt from a Big Lots store for the purchase of a boogie board; a wrapper from a boogie board; four cardboard boxes of Seroquel, an antipsychotic medication; several blister packs of Seroquel, with some of the pills "punched out"; an empty Seagram's 7 liquor bottle; a black t-shirt, a black hat, a leather jacket, and two fishing poles.

Lieutenant Brinkley said that police also discovered a leather tri-fold wallet and that the contents indicated the wallet belonged to the appellant. Finally, Lieutenant Brinkley found an envelope containing a microcassette audiotape and a tape player. After listening to the tape and considering the contents of the vehicle, Lieutenant Brinkley investigated the appellant's disappearance as a suicide. The appellant's mother, Patricia Gentry, came to the police station to pick up the appellant's belongings. Lieutenant Brinkley said that when Gentry heard the audiotape, she began "[c]rying uncontrollably, [and she] fell out onto the floor to the point where I offered to call EMS, the paramedics for her. I mean, very emotional."

Detective Cubberly was recalled to the stand, and he testified that he recognized the appellant's voice on the audiotape he received from the Nags Head Police Department. Detective Cubberly played the tape for the jury. On the tape, the appellant said, among other things, that he had taken a large quantity of medication and had consumed half a bottle of liquor. The appellant said that he was going to put on ankle weights, get on the boogie board, and paddle out into the ocean until he could not see land. The appellant said that he then planned to go to sleep in the ocean, thereby killing himself.

Stewart Irving Cottingham, Jr., a Deputy U.S. Marshall with the Fugitive Task Force, testified that he was contacted by the sheriff's office in Marlboro County, South Carolina, for assistance apprehending a fugitive from Tennessee. Marshall Cottingham said that he was provided with the appellant's name and photograph.

On August 16, 2005, Marshall Cottingham and other officers set up surveillance at a convenience store in Bennettsville, South Carolina, which is located in Marlboro County. Marshall Cottingham said police had developed information leading them to believe that the appellant was staying with a young female in a 1969 Winnebago travel trailer located approximately 100 yards from the convenience store. Mid-afternoon, police saw the appellant and a young female come out of the Winnebago. The appellant walked toward the convenience store. Marshall Cottingham said it was "readily apparent" that the appellant had tried to alter his appearance by putting on weight, growing a "stubby . . . Santa Claus beard," walking with a limp, and using a cane.

Marshall Cottingham said that when the appellant neared the surveillance van, the officers "pounced" on and arrested him. During the "takedown," the female ran back into the

Winnebago. Marshall Cottingham recalled that the appellant said his name was "Alex Sabastian Hendrix" and that he spoke with "an Australian or New Zealand accent." Marshall Cottingham told the appellant that he believed he was Kevin Allen Gentry from Sevier County, Tennessee, and that he had an arrest warrant for him. The appellant denied that his name was Kevin Allen Gentry and produced from his wallet a social security card bearing the name "Alex Sabastian Hendrix." Marshall Cottingham opined that the card had been "fraudulently altered." Marshall Cottingham said that the appellant's "rap sheet" indicated that he had a "tribal tattoo." Even after police located the tattoo on the appellant's body, the appellant adamantly denied that he was Kevin Allen Gentry. Also on the appellant's person was a North Carolina driver's license bearing A.H.'s photograph and the name "Jessie Marie Hendrix." When Marshall Cottingham confronted the appellant with the belief that the social security card had been altered, the appellant "stumbled" and started speaking with a southern accent. Marshall Cottingham said the appellant "caught himself" and reverted to an Australian accent, continually denying that he was Kevin Allen Gentry.

Marshall Cottingham said that, after he "secured" the appellant, he knocked on the door of the Winnebago. The female inside let Marshall Cottingham in the Winnebago and identified herself as "Jessie Marie Hendrix, wife of Alex Sabastian Hendrix." She said she was twenty-five years old, but, as she talked, it became "readily apparent" to him that she did not have the sophistication of a twenty-five-year-old and that she was really "a child." Eventually, the female confessed she was A.H. Marshall Cottingham said A.H. had not been physically held against her will. While Marshall Cottingham was in the Winnebago, he saw an obituary card bearing the name Kevin Allen Gentry and a photograph of the appellant, which was the "spitting image" of the man he had just arrested.

Marshall Cottingham said that Marlboro County was "very rural" and that the area where the appellant was located was "very isolated and secluded." Marshall Cottingham estimated that Marlboro County was approximately 320 miles from Sevier County and about 250 miles from Nags Head.

A.H. testified that she was born on June 5, 1989, and that she met the appellant when she was nine years old. A.H. recalled that their sexual relationship began when she was twelve or thirteen years old. She said that at the time of the offense involving the victim, A.H. was thirteen or fourteen and the appellant was in his thirties. She maintained that at that time, she had a "consensual relationship" with the appellant and lived with him. A.H. said the victim would sometimes come to the appellant's residence for A.H. to babysit. She said that when the victim was there, she, A.H., and the appellant would "have some drinks" and watch TV in bed. A.H. said that "[b]y hearing stuff, seeing, feeling movement in the bed, and being there," she could tell something inappropriate happened between the appellant and the victim. A.H. said the appellant put his hands on the victim's vagina on approximately five occasions. She recalled that when the victim spent the night, she slept in the same bed

as the appellant and A.H. A.H. acknowledged that at the appellant's direction, she performed oral sex on the victim while the appellant either performed oral sex on or had intercourse with A.H. She said she followed the appellant's instructions because she felt she did not have a choice.

A.H. testified that after the appellant was charged with raping the victim, she did not see him for a while. She later met him in Bennetsville, South Carolina, where they lived in a recreational vehicle (RV) for six months. A.H. said that while they were there, she went by the name "Jessie Marie Hendrix." The appellant used the name "Alex Sabastian Hendrix" and spoke with "a British accent." She and the appellant presented themselves as husband and wife. A.H. said that when they argued, the appellant would "do the guilt trip" and threaten to turn himself in to police. A.H. said the appellant "brainwashed me into thinking I didn't have anybody else, that he was the only one that loved me." A.H. said she loved the appellant and was dependent on him. The appellant told her that if he were caught, he would not get out of prison.

On cross-examination, A.H. said that she had gotten marijuana from the victim's parents and had seen them smoke marijuana while the victim was in the house. A.H. admitted that she had smoked marijuana and that being high could impair a person's ability to perceive things. However, she maintained that marijuana did not impair her ability to perceive the appellant's sexual abuse of the victim. A.H. acknowledged that when Detective Cubberly asked her if the appellant penetrated the victim with his fingers, she responded, "I suppose." She conceded that using the word "suppose" could indicate uncertainty. A.H. denied that Detective Cubberly molested her, but she said that she told the appellant and Gentry that he had. A.H. said that she was pregnant at the time Detective Cubberly interviewed her and that Detective Cubberly never threatened to take her baby if she did not testify. She said she initially told Detective Cubberly that the appellant had not sexually abused the victim because she was ashamed. She said she eventually told the truth because "I had to do it for me. I had to do it for [the victim] and her mother."

The defense's first witness was Cassandra Gail Todd. She said that around April 4, 2005, she was vacationing at Nags Head. She and a friend named Alex were walking on the beach when they saw a young man lying in the sand, close to the water. Alex asked the man, whom Todd identified as the appellant, if he was okay. Todd said the appellant was unresponsive, and his behavior led her to believe that he was "retarded." Todd stated that Alex helped the appellant sit up and that when they tried to talk to the appellant he started crying. She observed that the appellant "smelled like a brewery." Todd and Alex offered to help the appellant to his car, but he said that he needed to get back into the water. Todd opined that the appellant did not seem to be faking his condition. Eventually, Todd and Alex passed the appellant into the care of some other people. Todd said that later, Alex "called me from a payphone. He gave me [the appellant's] name and number, and it was on the

news, so I called his mom." Todd acknowledged that she had become friends with the appellant's mother.

Angela Carr testified that the appellant was her half-brother and that he had numerous tattoos. Carr recalled that after the appellant was arrested, she received two calls from A.H. During the first call, A.H. was upset and crying, and she told Carr that Detective Cubberly threatened to take her baby "if she didn't say what they wanted her to say." During the second call, A.H. told Carr that Detective Cubberly took her in a room alone and talked to her in an "ugly," "mean," and "sexually explicit" manner. A.H. also said that when Detective Cubberly patted her down, he touched her private areas.

Carr said that as the appellant's case progressed, his family posted fliers offering a reward for information that would exonerate the appellant. Carr said that the fliers generated only one call, which was from Cox, the victim's mother. Cox told Carr, "If you've got ten thousand dollars, I can make this go away or I'm going to the D.A." Carr asked Cox if she had any information that could help the appellant's case, and Cox hung up.

Carr said she was aware of the appellant's relationship with A.H. She said that she did not consider the relationship between the appellant, an adult, and A.H., a minor, to be illegal because "her mother gave permission" and they planned to get married.

The appellant testified that his date of birth was July 6, 1971, and that he was thirty-two or thirty-three at the time of the alleged offenses. The appellant denied that he ever had sexual contact with the victim. He acknowledged that he had an "inappropriate, illegal relationship" with A.H. which became sexual when she was fourteen years old. The appellant recalled that in the summer of 2003, the victim came to his residence approximately four times. He said that he worked in Knoxville most of that summer and was often not home during the day. He denied that he and the victim slept in the same bed and maintained that the victim was never present when he and A.H. were intimate.

The appellant acknowledged that he went to South Carolina while the instant charges were pending. He said he "[a]bsolutely" tried, albeit unsuccessfully, to commit suicide because he was afraid he would be "railroaded" at trial and incarcerated for the rest of his life. He stated that, due to his level of intoxication, he did not recall making the statements on the audiotape tape. He also did not recall why he did not return to Tennessee after his failed suicide attempt, explaining that during that time he was often inebriated and taking different medications. He stated that one of his medications, Seroquel, had side effects that included paranoia, dementia, suicidal thoughts, and amnesia. He said that he did not "recall a lot of that time of my life."

He acknowledged that while living in South Carolina he grew a beard and changed his hairstyle, but he said that he frequently changed his appearance. He said he could not recall walking with a cane, speaking with an accent, obtaining a fraudulent social security card, or identifying himself as "Alex Sabastian Hendrix." He said he was "massively inebriated and quite . . . mentally defunct at the time."

The appellant said that during the "incident" between A.H. and Detective Cubberly, he "was handcuffed belly-down in [his] living room, and all [he] could do was hear what was going on, her screaming and crying."

Based upon the foregoing proof, the jury convicted the appellant of rape of a child.

## II. Analysis

We begin our analysis by noting that page one of the appellant's brief, which specifically sets out his issue, is missing. However, the argument set forth in the argument section of his brief centers upon his contention that the trial court erred in admitting the audiotape as evidence of flight. Prior to trial, the appellant filed a motion in limine to exclude the audiotape, which was purportedly the appellant's "suicide note," pursuant to Tennessee Rules of Evidence 402, 403, and 404. The appellant argued that even if the audiotape were relevant to flight, the tape contained numerous irrelevant and highly prejudicial statements. Specifically, the appellant complains that his comments "about getting even with Detective Cubberly, his love for [A.H.], his religion, how he provided advi[c]e on how to commit arson, us[ing] profanity and mak[ing] other irrelevant and prejudicial statements" should have been redacted. The appellant argued that any probative value of the tape was outweighed by its prejudicial effect.

The audiotape consisted of the following statements;[2] the portions of the tape the appellant claims are inadmissible are in italics:

> Well guys I got a lot to say. Hm, I hope you'll understand. I've ah, told you all I was going fishing. Ah, before the chance for them to lock me up could happen. But ah, I'm just gonna say this as bluntly as possible. Mom, Ange, Shea I love you guys so much. But I'd rather be dead than locked away. *But there's some of the charges that these people have brought against* me I have never touched [the victim]. *I've never had any sort of relationship at all with ah, [C.H.] I believe that's her name. And ah, to believe that her that [B.H.] girl got together and got*

---

[2] We have chosen to quote from the transcript utilized by both parties on appeal.

*jealous because I was in love with [A.H.].* And had gotten permission from her mother to marry her. I ah, I just can't believe any of this has happened. And ah, you know I believe that there's life after this. And ah, I'll be keeping an eye on all of you. Mom, Ange, Shea I'll ah, guess I'll be seeing you before you see me. Ah, that's how spirits do it. I, I love you ungodly and ah, *if you ever see her again you tell [A.H.] that I loved her too. I would have done anything for her. I got her out of her mother['s] crack addicted ah, house. I told ah, her and Bud Lethco, Patty, Patty Bonhage and Bud Lethco that ah, how they could burn their house after they asked me without anybody ah, finding out that they'd done it. I guess that's ah., my bad I know we shouldn't a done that but only what else could I have done.* She ah, she never took care of [A.H.] I did. She was a horrible person. . . . *I mean I had to get her out of that house* it was a terrible, terrible place. And I know it has basically destroyed my life. But ah, I don't regret having helped her. I'm gonna address something to you guys. *Ah, I know that son-of-a-b[****], Det. Matthew Cubberly, I know that that mother f[*****] has done this all to me. Because he's ah, trying to buck for a big promotion. Well, he'll not get a big promotion off a dead man. Cubberly, f[***]. Mom I love you so much and please understand that I'll be happier in the next plane. When these bastards would let me be here. Ange sweetheart I guess you'll have to forget I had to fix everything. I'm sorry I won't be there to ah, to help you. But you're a smart girl you can do it.* Hello, Shea this is for you sweetie. Don't ever let nobody tell you you can't. Whatever you dream sweetheart you can make it happen. And I love you. I don't have really a regret that I won't be able to see my grandson grow up. But ah, I've seen him so that makes me feel pretty good. Ah, Mom, Ange ah, I don't think it's gonna hurt at all. So I really don't want you to dwell on that I took a massive amount of Ser[oquel] and ah, about half a bottle . . . of liquor so by the time I paddle out to where I can't see land anymore I, I [will] probably be ready to go to sleep anyway. *I need you guys to ah, remember me fondly so that when I come to you in my spirit form I won't ah, won't feel rejected* I, I really hate to feel rejected. Please ah, get these people if you can to tell the truth so that ever[y]body knows that I'm not some piece a sh[**] pedophilic rapist. I'm a good man I treat everyone with respect I have lived a strange life but I'm

not a bad person. I truly hope that ah, you all can find it in your hearts to forgive me for what I've done. Because you guys are really the ones that matter to me. *Please if, if you do find [A.H.] one day if you do see her would you tell her it's not her fault. It's not her fault. We were just living in the world where a, a man can't be a man by his own hand. He can't do what he must to live and love and survive. He has to play by a bunch of bullsh[\*\*] rules.* So ah, you guys prove me innocent, please prove me innocent. I'd hate for the world to go on thinking that I was a bad person. I'm not. I really ah, need you guys to know. . . how much I love you. I was so sad that all of ah, all this happened. Mother I'm sorry that they swindled you out of your land. I ah, the money I gave you I sold everything that I owned. I hope it helps you until you can get back on your feet. Ah, Ange please don't be upset that I'm doing this and ah, don't have bad thoughts from, whenever you go fishing sweetie. It's, it's so horrible this is just a horrible situation. And I, I can't live like this. I, I refuse to live like this. I'll ah, I guess I'm done. *See you guys when you guys get to the astroplane. You know that's the next world up after you lived these horrible lives in this world. But you know I'll be there waiting for you. And ah, Matthew Cubberly and all these mother f[\*\*\*\*\*\*] who that have done to me I'll be there waiting for you too. I'll be there waiting for you mother f[\*\*\*\*\*\*] too. I'll . . . make sure that you[r] afterlife is ah, much more miserable than the last year of my physical life.* And ah, Mom I'm probably ah, calm about this whole situation really. But you knew that in my heart I know that this will bring me peace. Well I'm going to ah, gotta go. I'm going to make sure that ah, that I get out far enough where there's no chance that I'll get back. It's . . . what I got the boogie board for. . . . It's, it'll be alright. You guys will live thru this. And we'll see each other in the next life I promise. My friends you know the ones that I care for. You tell them that I love them and that I'm sorry that I had to do this. And ah, you tell those people that have done me wrong that they'll have to meet me in the next life. And again Mom I'm so sorry about how much money you lost trying to help me trying to defend me. That's really a big regret. . . . Just you know how much I love you . . . . I'm just crying because I, *I there's got to be a law I'm sure before you guys move into the next world and I get to see you again* it's really it's kinda disturbing. Ah, when they

-11-

find me if they find me ah, cremation that's what I want. And ah, *I want you to ah, make sure that no ah, preaching priests preachers or anything say anything over my ashes.* You tell my Aunt Betty that I love her. You tell all the family that I love 'em. It's ah, this is my decision what I'm going to do is strictly on me. And I love you and I'll explain it to you all when I see you in the next world. I love you please ah, take care of my ah, animals. OK? Sorry I had to lay them on you like that but I wouldn't want to make the decision for them to take them into the ocean. I don't think my, my dog would really want to cooperate. I love you ungodly. *Make sure all those who, who should pay for these atrocities that's been visited, visited upon our family. Make sure they pay. Make sure they pay.* Well it's getting about that time. I suppose ah, I should go take a swim now. I'll have ah, took all my medicine, I've ah, drank a bit and ah, now I, I guess there's nothing else to do. I got my weights on I love you guys. Goodbye for now. *And ah, that son-of-a-bitch Cubberly needs to ah, be to pay for what he done to me.* He needs to pay for what he done [to A.H.] he took her into a room by herself. He molested her, frisked her, questioned her I know that ain't right. That just ain't right. You guys gotta do something about this. Please do something about this. Remember me think well of me. I love you Ange I can't tell you enough. Just remember to love me huh? I can't think of anything else to say to you. Except I'm sorry and ah, I hope everything works out for, for you in this life. Mama I, I love you. Ah, I gotta go now. If I don't do it now I'll, if I don't do it now I, I won't, won't do it if I don't do it now I gotta do it now. I love you.

At the conclusion of the hearing on the appellant's motion to exclude the audiotape, the trial court stated:

The tape is . . . admissible. It would be very difficult to redact, unless there was a specific agreement to do that. It is unlike the typical situation where you have an interview tape by a police officer where you have questions asked and information elicited. That is not relevant to the case. This, as has been presented to the Court, is a tape recording made by this [appellant] indicating that he has or is about to commit suicide,

-12-

and the State's position is that it was done to avoid prosecution. So I would have to find the tape is admissible, its content.

. . . .

Given the circumstances that have been represented, the Court will not require a redaction of the tape. It says what he said and it was purported to be a suicide note, recorded note, coupled with evidence that would suggest that he had committed suicide, then the whole tape would come in. This is what he said and it would be – certainly be evidence based upon the State's theory, that is, relevant to show that he was attempting to avoid prosecution.

Generally, to be admissible evidence must be relevant to some issue at trial. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal quotations and citations omitted).

Initially, we note that the statements on the tape were admissible as an admission by a party opponent. Tennessee Rule of Evidence 803(1.2)(A) provides, in pertinent part, that the hearsay rule does not exclude a party's own statement which is offered against that party. "This means that any assertion a party spoke, wrote, or did may be used against that party as an admission." Neil P. Cohen et al., Tennessee Law of Evidence, §8.06[3][a] (LEXIS publishing, 5th ed. 2005) (footnotes omitted).

Contrary to some common misconceptions, it does not matter that the statement was self-serving when made but turns out to be harmful by the time of trial. Accordingly, the misleading term, "admission against interest," should be banned from courtrooms and appellate opinions. Under Rule

-13-

803(1.2)(A), it does not matter whether the declaration was self-serving when made. Moreover, the admission need not be inculpatory, against interest, or even contrary to the trial position of the party who made it. If the opponent wants to use it, the statement comes in as evidence.

Id. (footnotes omitted); see also State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007). While not specifically citing Rule 803(1.2)(A), the trial court found the statements on the audiotape admissible because "[t]his is what he said" in "a tape this [appellant] voluntarily made and left behind."

However, neither of the parties, at trial or on appeal, argued regarding the statements' admissibility under Rule 803(1.2)(A). The appellant complains that in admitting the tape, the trial court "focused in significant part on the fact that the [appellant] made the tape." The appellant argues that the trial court focused on the wrong issue, namely the authenticity of the tape, instead of on the relevance of each of the statements on the tape. Further, the appellant contends that the trial court did not properly analyze the statements under Tennessee Rule of Evidence 403 or 404(b) and "made a cursory conclusion" that the tape in its entirety was relevant. The State argues that the tape in its entirety was admissible.

In addressing the arguments raised by the parties, we note that Tennessee Rule of Evidence 404 provides:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

-14-

(4) The court must exclude the evidence if its probative value is
outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character. If the evidence is relevant, then, upon request, the court will proceed to a Rule 404(b) hearing.

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character.

Regarding this issue, the trial court found, in accordance with the State's argument at trial and on appeal, that the audiotape was relevant to show the appellant fled to avoid prosecution. Notably,

> [a] long line of Tennessee cases has permitted introduction of evidence that a person tried to evade prosecution. This includes proof that the person fled or tried to flee the scene of a crime, hid to avoid apprehension, attempted suicide, resisted arrest, escaped from custody, or did not appear for trial. This circumstantial proof has been held to permit an inference that the fleeing person had a consciousness of guilt, criminal intent, knowledge or was somehow connected with the offense in question.

Cohen et al., Tennessee Law of Evidence, § 4.01[10].

Specifically, on the issue of flight, this court has stated:

> "[B]ecause flight or attempted flight may bear on the intent, purpose, or consciousness of guilt of [the] accused, or because

it may tend to connect [the] accused with the commission of the offense charged, it is admissible in evidence as a fact which may be considered by the jury, or the judge sitting as both judge and jury, and from which an inference may be drawn, in connection with other circumstances and in the absence of an explanation of the reasons or motive that prompted it, that the accused person is guilty.["] . . .

"The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction.  However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight."

Rogers v. State, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970) (quoting 22A C.J.S. Criminal Law § 625); see also State v. Berry, 141 S.W.3d 549, 587-89 (Tenn. 2004).  An accused's flight does not, alone, establish guilt, "but taken in connection with other facts may become one of a series of circumstances from which guilt may be inferred."  Sotka v. State, 503 S.W.2d 212, 221 (Tenn. Crim. App. 1972).

The probative value of flight as circumstantial evidence of the accused's guilt of the charged offense

"depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."

2 McCormick on Evidence § 263, at 219 (Kenneth S. Broun, ed., 6th ed. 2006) (quoting United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977)); see also 2 Clifford S. Fishman, Jones on Evidence § 13:2 (7th ed. 1994).  A leading treatise on evidence has explained that "[i]mportant factors in the analysis [of flight] are the timing of flight relative to the offense or to other significant events in the case, and the strength of the inference that the defendant was aware of, and motivated by, fear of apprehension for a particular offense."  2 McCormick on Evidence § 263, at 219 (footnotes omitted).

The State's theory at trial was that the appellant faked suicide to evade prosecution for the instant offenses. We note that even if the appellant truly intended to commit suicide, suicide has been considered analogous to flight. See United States v. Cody, 498 F.3d 582, 591-92 (6th Cir. 2007); see also State v. Robert Wayne Seffens, No. 01C01-9107-CR-00190, 1992 WL 75831, at *4 (Tenn. Crim. App. at Nashville, Mar. 16, 1992). Regardless of the authenticity of the appellant's suicide attempt, we conclude that many of the contested statements on the audiotape are relevant to the appellant's attempt to evade prosecution. Indeed, the appellant admitted on the audiotape that he was afraid of being convicted. The appellant contends that his references to the "spirit world," "the next world," and the "astroplane," as well as his comment that he did not want a priest to preach over his ashes, are references "to bizarre and unusual spiritual beliefs portraying the [appellant's] overall character in a very negative manner." We conclude that these statements underscore the detailed nature of the appellant's scheme to fake his suicide and flee prosecution. Further, the appellant's references to Detective Cubberly and his statements to "[m]ake sure they pay" were relevant because they indicate the appellant's reason for fleeing was the proceeding against him, especially in light of the appellant's comments that he would "rather be dead than locked away." In the instant case, we conclude that the reason for the appellant's flight is particularly relevant to the jury's consideration of the appellant's guilt. See 2 McCormick on Evidence § 263, at 218. Moreover, any prejudicial effect of these statements was minimal; accordingly, we conclude that the trial court did not err in allowing these statements to be admitted.

Additionally, we note that the evidence regarding the appellant's relationship with A.H. was highly relevant to "paint a picture" of the events surrounding the sexual abuse of the victim and the appellant's flight from authorities, especially in light of the fact that A.H. was with the appellant when the offenses were committed and that she was with the appellant when he was found. The appellant concedes that his relationship with A.H. has "some relevance" to the case. In our view, the appellant's relationship with A.H. was an integral part of the case. Our supreme court has stated that

> [a]lthough this reason is not one of the reasons frequently given for proffering evidence of other acts, evidence offered to show contextual background need not be excluded simply for the reason that it involves evidence of prior acts. If the contextual evidence is relevant to an issue other than criminal propensity and its probative value is not outweighed by the danger of unfair prejudice, then that evidence may be properly admissible.
>
> . . . .

. . . [S]uch evidence is often crucial to understanding the other material evidence at trial, and the absence of background evidence could have detrimental effects on the jury's comprehension of the offense in question. Events do not occur in a vacuum, and in many cases, knowledge of the events surrounding the commission of the crime may be necessary for the jury to "realistically evaluate the evidence."

State v. Gilliland, 22 S.W.3d 266, 271-72 (Tenn. 2000) (quoting Albrecht v. State, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972)) (footnote omitted). Accordingly, our supreme court held that "contextual background evidence, which contains proof of other crimes, wrongs, or acts, may be offered as an 'other purpose' under Rule 404(b) when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case." Id. at 272. We conclude that the statements about A.H. are contextual evidence and are relevant to the case at bar. Moreover, we note that A.H. testified about her relationship with the appellant. Therefore, any additional prejudice suffered by the appellant from the jury's hearing his statements did not outweigh the probative value of the statements. Thus, the trial court did not err in admitting these statements.

The appellant also contends that his statements regarding his conversation with Bud Lethco and Patty Bonhage implicated him in the unrelated crime of arson and were irrelevant to the proceedings. We conclude that these statements were not admissible simply because they "were part and parcel of the [appellant's] plan to evade prosecution." Any relevancy of the tape as evidence of flight did not necessarily render all of the statements therein to be admissible. Further, the statements were more prejudicial than probative. Therefore, we conclude that these statements should have been redacted from the tape.

Additionally, the appellant argues that his statements about charges brought against him because of his involvement with C.H. and B.H. "implicated [him] in criminal sexual activity with two other minors unrelated to the case on trial" and were irrelevant and prejudicial. First, we note that the jury was not informed that C.H. and B.H. were minors; the only information the jury heard was the appellant's denial of any involvement with them. Regardless, we conclude that the statements were irrelevant to the instant proceedings and should have been redacted from the tape. However, because the jury had only limited details, the comment was brief, and there was substantial proof against the appellant from the testimony of A.H. and the victim, we conclude that this error did not "'affirmatively appear to have affected the result of the trial on its merits.'" State v. Dotson, 254 S.W.3d 378, 388 (Tenn. 2008) (quoting Tenn. R. Crim. P. 52(a)); see also Tenn. R. App. P. 36(b). Therefore, we conclude that the error in admitting the statements regarding the arson and C.H. and B.H. was harmless.

Finally, the appellant maintains that when certain statements are made and language is used by an accused on an audiotape which portray the accused's overall character in a very negative manner, a tape should be redacted or held inadmissible. As support for his argument, the appellant cites State v. Daniel E. Pottebaum, No. M2004-02733-CCA-R3-CD, 2006 WL 1222710 (Tenn. Crim. App. at Nashville, May 5, 2006). However, the appellant's argument is unavailing as Pottebaum is distinguishable from the instant case.

In Pottebaum, the State sought to introduce an audiotaped conversation of the defendant to impeach him with prior inconsistent statements. Id. at *18. This court, in examining the tape, concluded that the statements on the tape were, at best, marginally inconsistent, lending little relevancy to the proceedings. Id. Moreover, the court stated that the defendant's tone of voice, reference to prior incarceration, cursing, and reference to inappropriate behavior reflected poorly on the defendant. Id. Therefore, this court concluded that the prejudicial impact of the tape outweighed its probative value. Id.; see also State v. Spike Hedgecoth, No. E2002-01869-CCA-R3-CD, 2003 WL 22668873, at *5 (Tenn. Crim. App. at Knoxville, Nov. 12, 2003). We acknowledge that on the audiotape the appellant used foul language, referenced inappropriate acts, and alluded to unorthodox spiritual beliefs; however, as we earlier stated, the majority of the tape is highly relevant to the appellant's flight and therefore to his guilt of the instant offenses. Thus, we conclude that the probative value of the majority of the tape was not outweighed by its prejudicial effect.

## III. Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE